THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.* WILLIAM WILKENS, surviving partner of the firm of H. BENNINGHAUS & CO.

*Guarantee of Bills of lading by an Association of Railroad Companies—Limitation of the power of the Master of a Ship—Negotiability of Bills of lading—Principal and Agent—Fraud of Agent—Liability of Principal.*

The Baltimore and Ohio Railroad Company with other railroad companies formed an Association under the name of the "Continental Line," for the transportation of freight to and from the west.   Each company agreed to furnish a number of cars to run as through cars over the several roads, and each agreed *to guarantee the bills of lading of the Association for goods loaded on such cars and destined to points on other roads, as stated on the face of the bills of lading in this case.*   The Association had agents at various points in charge of its business, one of whom, McC., was an agent of one of the western roads, and was acting as agent of the Association at Owanico, Illinois, and as such was authorized to sign bills of lading for the Association, and was also a merchant at Owanico, and did business with Benninghaus & Co. commission merchants in Baltimore; by the course of this business McC. consigned to Benninghaus & Co. car loads of grain which they were to sell for him on a certain commission per bushel; as such shipments were made McC. forwarded the bills of lading, and drew drafts or bills of exchange attached to them, on Benninghaus & Co., which the latter honored and paid on the faith of the consignments mentioned in the bills of lading; in the course of this dealing, and between the 23rd of June and the 9th of August, 1873, McC. fraudulently forwarded ten bills of lading for corn purporting to have been loaded on eleven cars, *but which in fact never was so loaded, or received at the depot or on any cars of the Association;* the drafts accompanying these fraudulent instruments were duly paid by Benninghaus & Co. upon the faith of the supposed consignments mentioned in them, without knowledge of this fraudulent conduct of McC.; and the latter having failed in business, and Benninghaus & Co. having made fruitless efforts to recover from him the amount thus advanced, they brought suit to recover it from the Baltimore and Ohio Railroad Company.   The several bills of lading referred to were substantially alike, and one of them was set out in the

record as a specimen.  It was duly signed by McC. as agent of the Associa-
tion, and bore a heading in this form: "*Continental Line—Fast Freight.*
The authorized fast freight express of the Baltimore and Ohio," and other
named "railroads, and their connections, by whom it is owned and managed
*and its bills of lading guaranteed,*" followed by a list of agents.  The receipt-
ing clause was as follows: "Received at the depot of the S. I. S. E. R. R.
Owanico, Aug. 9, 1873, of Jos. McCluskey, the following packages (contents
unknown) in apparent good order."  These initials designated the Spring-
field, Illinois and South Eastern Railroad, one of the roads forming the
Association and mentioned in the above heading.  Then follows: "Marks—
Baltimore.  *Consignee*—H. Benninghaus & Co.  *Destination*—Locust Point,
Baltimore, Md." with a description of two cars by their numbers, each
stated under the head of "Articles" as "1 car bulk corn," with weight and
rate of charges for freight.  After which followed this notice: "It is under-
stood that all connections recognize this bill of lading and will settle freight
accordingly.    Should overcharges occur and difficulty arise delaying a
prompt adjustment thereof, return bill of lading to the nearest agent or
general freight agent of the Continental Line, with all freight bills paid the
company, delivering the freight, and this bill of lading attached, for settle-
ment.    Claims for loss or damage must be presented to the delivering line
within thirty-six hours after the arrival of the freight."    Then followed a
number of conditions usual in such instruments, which it was stipulated the
shipper agreed to by "accepting this bill of lading."  HELD :

1st.  That the guarantee by the Association of its bills of lading, simply meant
that each company of the Association stipulated that it would be bound by
a bill of lading issued by any one of them for freight to be transported over
each and all the roads constituting the Line, in the same manner as if the
transportation was only over its own road.

2nd.  That by this arrangement and guaranty the shipper, besides other bene-
fits and conveniences, derived the advantage of the responsibility of each
and all the associated companies, for loss or damage to his goods occurring
on any part of the entire line, and the further advantage of suing the com-
pany nearest his home for such loss.

3rd.  That the defendant was not responsible to the plaintiffs for the advances
they made on the bills of lading fraudulently issued by its agent, for goods
never received by it, and never placed in its cars.

The master of a ship has no authority to sign a bill of lading for goods *not
actually* put on board, and therefore the owner of the ship is not responsi-
ble to parties taking, or dealing with, or making advances on the faith of
such an instrument which is untruthful in this particular.  The consignee

and every other party thus acting does so *with notice* of this limitation of the power of the master, and acts at his own risk both as respects the fact of shipment and the quantity of cargo purported by a bill of lading to be shipped.

Bills of lading are not *negotiable* in the same sense in which bills of exchange or promissory notes are. They stand in the place of the goods they represent, and delivery or endorsement of them transfers the right of property in the goods, but not in the contract itself so as to enable the endorsee to maintain at the common law an action on it in his own name.

A railroad company is not liable for advances made by a commission merchant upon the faith of a bill of lading fraudulently signed by one of its station agents, the goods therein specified never having been shipped or received at the depot for transportation.

*Tome vs. Parkersburg Branch R. R. Co.*, 39 *Md.*, 36, commented on and distinguished from this case.

APPEAL from the Superior Court of Baltimore City.

This suit was brought in the Superior Court of Baltimore City, by the appellee as surviving partner of the firm of H. Benninghaus & Co. against the appellant, and tried before the Court upon an agreed statement of facts, which will be found sufficiently set out in the opinion of this Court.

*First Exception.*—The plaintiff prayed the Court to find in his favor upon the agreed statement of facts.

The defendant prayed the Court, first, to find in its favor upon the agreed statement of facts; secondly, to find in its favor upon the agreed statement of facts, because the cars of corn mentioned therein, were never received by the Continental Line, nor any member thereof, nor by the defendant, and were never loaded by John McCluskey.

The Court (DOBBIN, J.) granted the prayer of the plaintiff and rejected the prayers of the defendant; to this ruling of the Court the defendant excepted.

*Second Exception.*—The Court gave judgment in favor of the plaintiff against the defendant, on the agreed statement of facts, for $1485.36. To the giving of this

judgment the defendant excepted, and prosecuted this appeal.

The cause was argued before BARTOL, C. J., STEWART, MILLER, ALVEY and ROBINSON, J.

*John K. Cowen*, for the appellant.

Does the fraudulent act of McCluskey, in signing bills of lading for corn not received, bind the appellant to make good the advances made by McCluskey's factors, Benninghaus & Co., on the faith of these fraudulent instruments? This question has been settled by judicial determination. An agent of a common carrier can only bind the carrier for goods put on board, and if the agent signs bills of lading for goods not shipped, this does not bind the carrier, even to innocent parties who have advanced money on the faith of them. The remedy is not against the owner of the transportation line, but against the one purporting to be the shipper, and the agent.

The agent has no authority, either apparent or real, to sign bills of lading for freight not shipped. The agent's *real* authority is to give bills of lading for goods put on board the cars, and his *apparent* authority, *i. e.*, the power with which he is clothed by the employer in the character in which he is held out to the world, is exactly the same. There is no difference in this case between the apparent and *real* authority. The *words* of the agent's commission are as broad as the character given him by the *acts* of the principal. The reality of his authority corresponds precisely with the appearance of the authority confided to him by his employer. The act of McCluskey, therefore, was not within the scope of his real or apparent authority. It was *unauthorized*, and it is a fundamental proposition that one person can be bound only by the *authorized* acts of another.

"A principal is responsible for that *appearance of authority* which is caused by himself; but not for that *appearance* of *conformity* to authority, caused only by the agent."

An agent may clothe himself with all the *indicia* of authority, and yet his acts may be outside of the scope of both his real and apparent authority. A principal cannot be held bound simply because an agent holds a commission from him and falsely asserts that his acts come within its scope.

Upon these principles the Courts of England and some of the United States, have decided that a bill of lading signed by the agent of the carrier, when the goods have not been received for shipment, does not bind the carrier; the agent's act is outside of the scope of his authority, and the owner of the line of transportation is not responsible for the *act* of his agent, which causes an *appearance of conformity* to his authority. See *Grant vs. Norway,* 2 *Eng. Law & Eq.,* 337; *Hulbersty vs. Ward,* 8 *Excheq.,* 330; *Sears, et al. vs. Wingate, et al.,* 3 *Allen,* 103; *Schooner Freeman vs. Buckingham,* 18 *How.,* 191; *The Loon,* 7 *Blatchford, C. C. Reps.,* 244; *Fellows vs. Steamer Powell and Owners,* 16 *Louisiana Annual,* 316; 1 *Parsons' Maritime Law,* 135, *note* 2; *Redfield on Carriers and Bailments, sec.* 263; *Story on Agency,* (6*th ed.,) sec.* 451; *Angell on Carriers, sec.* 223; 1 *Parsons on Contracts,* (5*th ed.,)* 45; *Coleman vs. Riches,* 29 *Eng. Law & Eq.,* 323; *Second National Bank of Toledo vs. Walbridge,* 19 *Ohio State,* 425; *Jessel vs. Bath,* (*Law Reps.,*) 2 *Court of Exchequer,* 274; *Dean, et al. vs. King, et al.,* 22 *Ohio State,* 118; *Louisiana Bank of New Orleans vs. Laveille, et al.,* 52 *Missouri,* 380; *Smith's Mercantile Law,* (*Ed.* 1870,) 297.

It is said, however, that the case of *Tome vs. Parkersburg R. R. Company,* 39 *Md.,* 36, governs this case, and that applying the principle in that case, the appellant is responsible for the act of McCluskey, although it was not within the real or apparent scope of his authority.

We do not understand that the Court in that case intended to overrule all of those English and American decisions, which hold that bills of lading signed by agents of carriers, for goods not shipped, cannot bind the owner of the transportation line.

That principle has been adopted and acted upon by the Courts and the commercial public, and it has been laid down as good law by all the text writers upon the law of agency and carriers. No Court of final resort has decided to the contrary. There is an unbroken current of authority, and it is nowhere intimated in the opinion of the Court in the *Tome Case*, that this rule has been changed. In the opinion of the minority of the Court, the leading cases of *Grant vs. Norway*, and *Coleman vs. Riches*, are cited as undoubted law, and this position is not sought to be controverted in the majority opinion.

The *Tome Case* is quite distinguishable from this one. The facts in that case are quite different from the facts in this. There, the agent, whose wrongful act caused harm, was the treasurer of a railroad company, with very large and somewhat undefined powers, and the instrument wrongfully issued, was a certificate of stock, which is a mere *statement* of ownership, or interest in property.

The power and authority of the treasurer and transfer agent of a railroad company differs much from that of a station agent at a country town; and a bill of lading, which is simply a contract to carry at a fixed rate, is quite a different instrument from a certificate of stock.

The certificate of stock fulfils its purpose by merely stating the facts of ownership. But a bill of lading performs an entirely different function—it is a contract for the transportation of goods. It is not intended to give information as to the ownership of intangible property. The agent who signs it is not held out to the public as authorized to make statements in regard to property, but only to make contracts to carry it. The property is tan-

gible, and whether it has been shipped can be determined in many ways, without applying to the agent.

In this case, McCluskey was the consignor, and Benninghaus & Co. were his factors. It was the act of the principal which caused loss to the agent, and it was not the act of the agent of the railroad company, as such, which occasioned the injury.

But it is also said that bills of lading are negotiable. What does negotiable mean when applied to such instruments? Not that they are the promissory notes or bills of exchange of the company, whose agent signs them. No case asserts that. When they are said to be negotiable, nothing more is meant than that the transfer of the *bill of lading* transfers the title of the transferrer, to the goods therein named, to the transferree. But if there are no goods, or if the transferrer has no title to the goods, nothing is conveyed by an endorsement and delivery of the bill of lading.

McCluskey purports to be the shipper of the freight in these bills of lading. The contract of the company is with him as shipper. What rights can the consignee have that are greater than those of his consignor? McCluskey, consignor, has none; neither, therefore, can Benninghaus & Co., his factors, the consignees, have any. They acquired only his title, and he had none.

There are many analogous cases, which show that he who treats with an agent of limited authority, the *limitations* of whose authority are known, is bound to see that the act of the agent does not exceed those limitations. The agent, McCluskey, had a limited authority; he was only authorized to sign a bill of lading for merchandise shipped. This limitation upon his powers was known to Benninghaus & Co., when they advanced moneys on the drafts attached to the bills of lading. They knew that the company had only authorized such bills of lading to be given for goods shipped; they knew that the principal

did not hold the agent out to the public, as possessing any other authority, than to give bills of lading for goods on board ; and that if he should give such an instrument the act was unauthorized by the principal. The duty of inquiry was therefore incumbent on them, to see whether the agent had exceeded his authority ; as they trusted without such inquiry, they trusted to the good faith of the agent and shipper, and not to the liability of the principal. *Story on Agency*, sec. 133, *and note* 2 *to sec.* 127 ; 1 *Amer. Leading Cases*, 552, 561, (*4th Ed.;) Mussey vs. Beecher*, 3 *Cush.*, 511 ; *Lowell Five Cents Savings Bank vs. Inhabitants of Winchester*, 8 *Allen*, 118 ; *Stagg vs. Elliott*, 10 *Com. Bench, N. S.* 371, (104 *E. C. L.*, 373.) In *Adams Express Company vs. Trego*, 35 *Md.*, 68, this Court has approved *Grant vs. Norway, Coleman vs. Riches, and Hubbersty vs. Ward.*

*Arthur Geo. Brown* and *Fred. W. Brune*, for the appellee, argued,

That the appellant was responsible for the loss the appellee had suffered from the fraud of McCluskey, its agent, and that the judgment of the Superior Court should be affirmed ; and relied upon the following authorities: *Code of Pub. Gen. Laws, Art.* 3, *sec.* 3 ; *Tome vs. Parkersburg Branch R. R. Co.*, 39 *Md.*, 36, 76, 78, 79, 80, 81, 102, 103, 104 ; *Hall vs. Hinks*, 21 *Md.*, 406, 416 *to* 420 ; *Lister, &c. vs. Allen*, 31 *Md.*, 543 ; *Merchants' Bank vs. State Bank*, 10 *Wallace*, 605, 644-7 ; *Dickerson vs. Seelye*, 12 *Barb.*, 99, 102 ; *Meyer vs. Peck*, 28 *N. Y.*, 598, 9 ; *McNeil vs. Tenth Nat. Bank*, 46 *N. Y.*, 325 ; *Cartwright vs. Wilmerding*, 24 *N. Y.*, 521 ; *Howard vs. Tucker*, 1 *B. & Ad.*, 712 ; *McNeil vs. Hill*, 1 *Woolworth*, 96 ; *Michel vs. Ware*, 3 *Nebraska*, 229 ; 1 *Abbott on Shipping*, 323, (*margin ;) The J. W. Brown*, 1 *Bissel*, 76, 79 ; *Bigelow on Estoppel*, 47 ; *Barwick vs. English Joint Stock Bank*, 2 *Court of Excheq.*, 259, 265, 266, (*L. R.;) Ranger vs. The Great*

*Western Railway Co.*, et al., 5 *H. of L.*, 86; *Mackay vs. Commercial Bank of New Brunswick*, 5 *Privy Coun. Appeals*, 394, 402, 410, (*L. R.*)

"If one of two innocent persons must suffer by a deceit, it is more consonant to reason that he who puts confidence in the deceiver should be a loser rather than a stranger." *Carpenter vs. Longan*, 16 *Wall.*, 273; *Hern vs. Nicholls*, 1 *Salkeld*, 289.

This principle, sustained by the authorities thus quoted, applies with peculiar force to this case, for McCluskey was not only the agent of the appellant at Owanico, duly authorized to transact its business and sign its bills of lading, but was also "a merchant at Owanico doing business with the plaintiff."

If he had been simply a merchant, he could not have successfully perpetrated this gross fraud. It was *because* he was both a merchant and the agent of the appellant, that he had it in his power to deceive and defraud at the same time his employers and Benninghaus & Co.

The Continental Line having seen fit to appoint for its agent at Owanico, a man who was a merchant dealing in grain, is responsible for the consequences of such employment.

Being the accredited agent of the line, and having exclusive control over its printed blanks and bills of lading, McCluskey was enabled to represent, (as he did in this case,) that in his official capacity *as agent*, he had received from himself in his individual capacity *as merchant*, the fictitious car loads of corn, on the faith of the supposed shipment of which Benninghaus & Co. paid his drafts, and incurred the loss which they seek now to recover.

MILLER, J., delivered the opinion of the Court.

This case presents an important question. It was tried before the Judge of the Superior Court upon an agreed statement of facts, from which it appears that the appel-

lant with other railroad companies, formed an association under the name of the "Continental Line," for the transportation of freight to and from the west. Each company agreed to furnish a number of cars to run as through cars over the several roads, and each agreed *to guarantee the bills of lading of the association for goods loaded on such cars, and destined to points on other roads, as stated on the face of the bills of lading in this case;* the association had agents at various points in charge of its business, one of whom was Joseph McCluskey, who was agent of one of the western roads, and was acting as agent of the association at Owanico, Illinois, and as such, was authorized to sign bills of lading for the association, and was also a merchant at Owanico, and did business with the appellees, Benninghaus & Co., commission merchants in Baltimore; by the course of this business, McCluskey consigned to Benninghaus & Co., car loads of grain, which they were to sell for him on a certain commission per bushel. As such shipments were made McCluskey forwarded the bills of lading, and drew drafts or bills of exchange attached to them, on Benninghaus & Co., which the latter honored and paid on the faith of the consignments mentioned in the bills of lading; in the course of this dealing, and between the 23rd of June and the 9th of August, 1873, McCluskey fraudulently forwarded ten bills of lading for corn, purporting to have been loaded on eleven cars, *but which in fact, never was so loaded or received at the depot, or on any cars of the association;* the drafts accompanying these fraudulent instruments were duly paid by Benninghaus & Co., upon the faith of the supposed consignments mentioned in them, without knowledge of this fraudulent conduct of McCluskey; and the latter having failed in business, and Benninghaus & Co., having made fruitless efforts to recover from him the amount thus advanced, they have brought this action to recover it from the appellant.

The several bills of lading referred to, are substantially alike, and one of them is set out in the record as a specimen. It is duly signed by McCluskey as agent of the association, and bears a heading in this form: " CONTINENTAL LINE—FAST FREIGHT. The authorized fast freight Express of the Baltimore and Ohio," and other named "railroads and their connections, by whom it is owned and managed, *and its bills of lading guaranteed,*" followed by a list of agents. The receipting clause is as follows: "Received *at the depot* of the S. I. S. E. R. R., Owanico, August 9th, 1873, of Joseph McCluskey, the following packages, (contents unknown,) in apparent good order." These initials designate The Springfield, Illinois and Southeastern Railroad, one of the roads forming the association, and mentioned in the above heading. Then follows: "*Marks*—Baltimore. *Consignee*—H. Benninghaus & Co. *Destination,*—Locust Point, Baltimore, Md.," with a description of two cars by their numbers, each stated under the head of "Articles" as "1 car, bulk corn," with weight and rate of charges for freight. After which follow this notice: " It is understood, that all connections recognize this bill of lading, and will settle freight accordingly. Should overcharges occur, and difficulty arise, delaying a prompt adjustment thereof, return bill of lading to the nearest agent or general freight agent of the Continental Line, with all freight bills paid the Company delivering the freight, and this bill of lading attached for settlement. Claims for loss or damage, must be presented to the delivering line within thirty-six hours after the arrival of the freight." Then follow a number of conditions usual in such instruments which it is stipulated the shipper agrees to, by "accepting this bill of lading."

We have thus stated, more at large than is usual in an opinion, the purport of the agreed statement of facts, and the terms of these instruments, because in the course of the argument, counsel for the appellees attached special

importance to the statement set out on their face, that the association *guaranteed* its bills of lading. But looking to the agreed facts and the terms of these instruments, we are of opinion, this guaranty simply means that each company composing this association, stipulates that it will be bound by a bill of lading issued by any one of them, for freight to be transported over each and all the roads constituting the line, in the same manner as if the transportation was only over its own road. For instance, the Baltimore and Ohio Company, whose road extends from Baltimore to the Ohio River, by joining this association and making this guaranty, contracts that it will be responsible for bills of lading for freight, over any of the associated western roads, in the same manner it would be for an ordinary bill of lading over its own road from Baltimore to Wheeling. By this arrangement and guaranty, the shipper, besides other benefits and conveniences, derives the advantage of the responsibility of each and all the associated companies, for loss or damage to his goods occurring on any part of the entire line, and the further advantage of suing the company nearest his home for such loss. Thus a shipper of grain or other produce to Baltimore or Philadelphia, may sue his home company for loss or damage, occurring in the transportation between Wheeling and Baltimore, or Baltimore and Philadelphia, and in like manner, the Philadelphia or Baltimore merchant shipping his goods to the west, may sue the Philadelphia, Wilmington and Baltimore, or the Baltimore and Ohio Company, for like loss occurring on any of the western connections of the line. This, in our opinion, was the intention and extent of this guaranty. It imparts no other or additional force or sanctity to the bill of lading. The circumstance of such guaranty, places the responsibility of the appellant upon no higher ground than if it had issued an ordinary instrument of that character, for the transportation of freight over its own road exclusively.

This being so, is there any legal principle which makes the appellant responsible to a consignee for advances on a bill of lading fraudulently issued by its agent who was also his consignor, for goods never in fact received by it, and never placed in its cars? If any doctrine of commercial law can be regarded as well settled, it is, that the master has no authority to sign a bill of lading for goods *not actually put on board* the vessel, and therefore, the owner of the ship is not responsible to parties taking, or dealing with, or making advances on the faith of, such an instrument which is untruthful in this particular. The consignee and every other party thus acting does so *with notice* of this limitation of the power of the master, and *acts at his own risk* both as respects the fact of shipment and the quantity of cargo purported by a bill of lading to be shipped. In the early case of *Lickbarrow vs. Mason*, 2 *Term Rep.*, 75, it was said by BULLER, J., that a bill of lading is *negotiable*, and on this an argument has been frequently made (supported to some extent by the *dicta* of able Judges) that a third person dealing with such instruments, should be protected in his reliance on them, according to their exact tenor, against charterer and owners as well as masters. But in *Grant vs. Norway*, 2 *Eng. Law & Eq. Rep.*, 337, where the question was for the first time distinctly presented for adjudication in England, the Court of Common Pleas, after full consideration, held that the master of a ship signing a bill of lading for goods which had never been put on board, is not to be considered the agent of the owner in that behalf so as to make the latter responsible to an endorsee of the bill for value. That decision settled the law in England. It has been followed in many cases in which, in extension of the same principle, it has been held that a bill of lading so signed, is not conclusive against the owner as to the *quantity* of goods or cargo shipped. Among the recent cases on the subject is that of *Jessel vs. Bath*, 2 *Excheq.*,

(*Law Rep.,*) 267, from which we learn that Parliament in legislating in the matter, has gone no further than to enact "that every bill of lading in the hands of a consignee or endorsee for valuable consideration, representing goods to have been shipped on board a vessel, shall be conclusive evidence of such shipment, against the *master or other person signing the same,* notwithstanding that such goods or some part thereof may not have been so shipped." This Act leaves untouched the principle and rule of law before stated, which has been thus firmly settled by the Courts, and the vast maritime commerce of England has been, and is to this day, conducted subject to, and in recognition of, that rule. *Brown, et al. vs. The Powell Daffryn Steam Coal Co.,* 10 *Common Pleas,* (*Law Rep.,*) 562.

In this country the Supreme Court of the United States in *Schooner Freeman vs. Buckingham,* 18 *How.,* 182, adopting the case of *Grant vs. Norway,* have decided that neither the owner nor the vessel, is responsible to an innocent purchaser or holder of a bill of lading, signed by the master, for goods not actually shipped *and intended as an instrument of fraud.* They place their decision as respects the non-liability of the owner, upon the ground of *want of authority* in the master, who, they say, "has no more an apparent authority to sign bills of lading than he has to sign bills of sale of the ship. He has an apparent authority, if the ship be a general one, to sign bills of lading for *cargo actually shipped;* and he has also authority to sign a bill of sale of the ship, when, in case of disaster, his power of sale arises; but the authority in *each case* arises out of, and depends on, a particular state of facts; it is not an unlimited authority in the one case more than in the other, and his act in either case does not bind the owner, *even in favor of an innocent purchaser,* if the facts upon which his power depended did not exist; *and it is incumbent upon those who are about to change their condition, upon the faith*

Balto. & Ohio R. R. Co. *vs.* Wilkens, &c.

*of his authority, to ascertain the existence of all the facts upon which his authority depends.''* So in other Courts where the question was directly presented the same rulings have been made. Such were the decisions in *Sears, et al. vs. Wingate,* 3 *Allen,* 103, in the case of the *The Loon,* 7 *Blatch. C. C. Rep.,* 244, in *Fellows vs. Steamer Powell and Owners,* 16 *Louisiana Ann. Rep.,* 316, in *Dean, et al. vs. King, et al.,* 22 *Ohio,* 118, and in *Louisiana National Bank of New Orleans vs. Lavielle, et al.,* 52 *Missouri,* 380. We have in fact been referred to no case either in this country or in England, (nor have we found any) in which a contrary decision has been made where the question was *necessarily* and *directly* raised for adjudication. We take it therefore that this doctrine is too well grounded in the commercial jurisprudence of both countries, to be longer open to question or doubt.

Nor have we any difficulty in applying that doctrine to the instruments before us in this case. A bill of lading is a very ancient but not exclusively a *sea* document. It has been long used in both countries by carrying companies in transportation on lakes and rivers by steamboats, as well as sailing vessels, and on canals, and in all such cases it has been denominated and treated as a commercial instrument. In later times similar documents have been commonly if not universally used by railway companies in land carriage. What good reason exists why this principle should not apply to them, as well as to bills of lading used in shipping? We see none. On the contrary, are there not much stronger reasons for its application to this class of documents? The master of a ship is necessarily clothed with a real as well as an apparent authority, much more extensive than belongs to the station agents of a railroad company. His control over the vessel, his power to make contracts respecting it, his discretion in the use and management of it for the benefit of his owners, on the high seas and in distant ports, reach far beyond those of

the latter. A bill of lading signed by him and forwarded by mail oftentimes arrives at the port of destination months before the vessel and cargo, and the necessities as well as the convenience of commercial transactions, requiring its transfer, and advances on the faith of it, are much stronger than can possibly exist in dealing with similar instruments in railway transportation. In the latter but a few days usually intervene between the arrival of the bill of lading by mail, and the goods by the cars, and besides this, the telegraph is at hand affording to any one, asked to make advances on the faith of such documents, easy and speedy means of ascertaining whether the goods have been in fact laden in the cars or received at the depot of shipment or not. If, therefore, there be any good reason for exempting the owner of a vessel from responibility for a bill of lading, false in this respect, signed by the master who is his agent, it must apply *a fortiori* to a railway company, with respect to similar acts of its station agents along its line of road. The rule has been applied to a receipt given by the agent of a wharfinger purporting to be for goods received at the wharf, when in fact they were not, (*Coleman vs. Riches*, 29 *Eng. Law & Eq. Rep.*, 323,) and to receipts by a warehouseman for goods received at his warehouse. *Second National Bank of Toledo vs. Walbridge*, 19 *Ohio*, 419. The law in fact regards none of these instruments as *negotiable*, in the same sense in which a bill of exchange or a promissory note is so. They stand in the place of the goods they represent, and delivery or endorsement of them transfers the right of property in the goods, but not in the contract itself, so as to enable the endorsee to maintain at the common law an action on it in his own name. Thus in *Thompson vs. Dominy*, 14 *Mees. & Wels*, 403, PARKE, B., said, "I have never heard it argued that a contract was transferable except by the law merchant, and there is nothing to show that a bill of lading is transferable under any custom of merchants;"

and ALDERSON, B., added : " This is another instance of the confusion, as Lord ELLENBOROUGH in *Waring vs. Cox*, expresses it, which 'has arisen from similitudinous reasoning upon this subject.' Because in *Lickbarrow vs. Mason*, a bill of lading was held to be *negotiable*, it has been contended that that instrument possesses all the properties of a bill of exchange ; but it would lead to absurdity to carry the doctrine to that length. The word 'negotiable' was not used in the sense in which it is used as applicable to a bill of exchange, but as passing the property in the goods only." Neither a railroad company nor a ship owner can be made liable in a case like this, upon any theory that these instruments are negotiable like bills of exchange. The liability in either case must depend on the question of the authority of the master or agent, to bind his principal by such acts. And as we have seen, it has been conclusively settled that no such authority exists, and that every one taking such instruments, or making advances on the faith of them, must be regarded as having notice of this want of authority, and acts at his own risk and on the responsibility of the master or agent alone for damages, as to the truthfulness of the statements appearing on the face of such documents, that the specified goods have been shipped or received at the depot for transportation.

This well settled principle we did not intend to disturb by our decision in the *Parkersburg Stock Cases*, 39 *Md.*, 36. These cases were carefully considered and we there determined that the corporation was responsible for the acts of its treasurer and transfer agent, who surreptitiously and fraudulently issued for his own benefit, false and forged *certificates of stock* of the company, and passed them off upon the commercial public who advanced money on pledges of them, and received, treated and acted upon them as genuine. This treasurer and transfer agent was made by the company, the custodian of the ledger and other books relating exclusively to the ownership and

transfer of its capital stock ; he was authorized to prepare and countersign all certificates of stock to be issued, and to affix the company's ·seal (which was entrusted to his keeping and placed in his office,) to all such certificates when signed by the president ; he was in fact constituted the executive officer of the corporation with large discretionary powers, and was held out by the company to the public as the proper party from whom information as to the ownership of its stock was to be ascertained, and in fact *as the source* of information on that subject. In this way the public were by the acts of the corporation "exposed to the risks of fraudulent devices most dangerous because most difficult to detect." The authority of such an officer both real and apparent, differs widely in its extent and scope from that of a mere station agent. The instruments issued in those cases, are also of an entirely different character from those issued in this case. The distinction between them has been well stated in the brief of the appellant's counsel. Stock in corporations is intangible property. Stock certificates are not promises to do anything with particular articles of property, but simply statements of·ownership of shares or interests in property. It is the peculiar province of the treasurer and transfer agent, whom the company authorizes to give, and make such statements, to make known to the commercial public dealing with the stock, the facts of such ownership and to whom the shares belong. But a bill of lading performs a very different function. It evidences and is a contract for the transportation of goods, and not an instrument intended to give information as to the ownership of intangible property. The agent who signs it is not held out to the public as authorized to make statements like those in a certificate of stock, but only to make contracts to carry visible and tangible property. The property which is thus stipulated to be carried being visible and tangible, the fact whether it has been shipped or received at the depot for

Balto. & Ohio R. R. Co. *vs.* Wilkens, &c.

shipment or not, can be determined and easily determined in a multitude of ways without applying to the agent. To the general doctrines on which our decision in these *stock cases* was based, there is, and must be, the exception of the recognized and well settled principle of commercial law in reference to bills of lading, which we have stated, and which governs the present case.

But even under the doctrine upon which the appellees' counsel rely that "if one of two innocent persons must suffer by a deceit, it is more consonant to reason that he who puts confidence in the deceiver should be the loser rather than a stranger," we do not clearly see how the appellees are strangers to this transaction, or how it can be said the company more then they put confidence in the deceiver, for whilst the deceiver was the company's agent, he was also their consignor with whom they had been doing business. If as agent he deceived the company, as their consignor with whom they were dealing, he equally deceived the appellees, and if they relied on him as an honest and trustworthy consignor and business correspondent and dealer, and were deceived, as they undoubtedly were by him, how can it be consonant with reason and justice for them to shift their loss arising from such confidence and trust, upon those who were equally deceived by the same party? But, however this may be, we rest our decision upon the principle of commercial law as fully set forth in this opinion. Being satisfied the appellees are not entitled to recover, upon the facts stated in the agreement upon which the case was submitted to the Superior Court, we shall reverse the judgment appealed from and give judgment for the appellant.

> *Judgment reversed, and*
> *judgment for the appellant.*

(Decided 15th February, 1876.)