FREDERICK TIEDEMAN *vs.* JAMES KNOX.

*Negotiability of Bills of Lading—Act of* 1876, *ch.* 262.

About the 9th or 10th September, 1878, C. & Co. of Charleston, S. C., purchased a lot of flour from T., of St. Louis, through W., C. & Co's agent in Charleston, to be shipped to Charleston *via* Baltimore, subject to the order of C. & Co., and about the same time, also purchased other flour from other parties in St. Louis, to be shipped in the same way. T. and the other parties in St. Louis shipped the flour by rail, consigned to C. & Co., Baltimore, and forwarded to them the bills of lading therefor.    On 16th September, C. & Co. wrote from Charleston to K. & Co., in Baltimore, a letter enclosing bills of lading, endorsed by them in blank for 500 barrels of flour from St. Louis, and directed them to hold the same for the account of C. & Co. as they were not then able to get through freight *via* the Baltimore steamers, and they added : " This flour should be there when you receive bills of lading, so please attend to it at once; we may draw on you for amount to pay our draft due 19th *inst.*, and if not, take same up and charge to our account."    Upon receipt of this letter with the enclosed bills of lading, K. & Co. paid and took up the draft due the 19th inst. as requested.    There had been for some time dealings between C. & Co. and K. & Co., and among other transactions of a similar character, there was this draft for $1803.75, drawn by K. & Co. to their own order and accepted by C. & Co., and which K. & Co. had endorsed, and had discounted by a bank in Baltimore.    On 20th inst., C. & Co. wrote another letter to K. enclosing a bill of lading endorsed by them in blank for 200

barrels, thus making 700 in all, and in this, they directed him, if he could not ship the flour to them at 15 cents per barrel, to hold it for their account, or ship it to a good market, or, if he thought best, to sell it in Baltimore, but not at a loss, and place the net proceeds to their credit. The flour began to arrive in Baltimore on the 18th, and on the 22nd the last of it was received. K. tried to sell it in Baltimore without success, and was unable to forward it to C. & Co. at the rate they named. K. then on the 24th, shipped it to Liverpool, and drew a draft on the consignees with a bill of lading attached, which he had discounted, and the proceeds of which he received and retained. After this, he was informed by a letter from C. & Co. dated the 25th, of their failure, and on the 27th he received telegrams from T. and the other parties in St. Louis, to hold the flour subject to their order, as it had not been paid for and they had been defrauded. To these telegrams, K. replied that the flour came regularly to his hands and had been shipped to Europe, that C. & Co. owed him over $6000, and he should retain the flour or its proceeds against that indebtedness. The proceeds of the flour bought from T. were not sufficient to pay the draft which fell due the 19th September, and which had been taken up by K. on that day. K. had also paid other acceptances of C. & Co. subsequent to the 27th · September, for amounts in excess of the value of all the flour. The purchases of the flour by C. & Co. were on a credit of 30 days, and they never paid for it. T. offered evidence tending to show, that C. & Co. were insolvent, and knew they were so at the time they made these purchases, but there was no evidence to establish the fact that K. knew of their insolvent condition, or had any reason to suspect it, prior to the shipment of the flour to Europe. Before suit was instituted, T. demanded the flour from K., and he refused to deliver it. On an action of *trover* brought by T. against K. to recover damages for the conversion of the flour, it was HELD :

That T. could not recover.

Under the Act of 1876, ch. 262, regulating the issue, negotiability and transfer of bills of lading, &c., a party receiving a bill of lading in payment of an antecedent debt becomes a purchaser and *bona fide* holder thereof for value, as effectually as if it had been a bill of exchange or promissory note.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ROBINSON and IRVING, J.

*Orlando F. Bump,* for the appellant.

*William A. Fisher* and *Charles Marshall,* for the appellee.

MILLER, J., delivered the opinion of the Court.

The Act of 1876, ch. 262, provides that "all bills of lading" executed in this State, or, if executed elsewhere, providing for the delivery of merchandise within this State, "shall be and they are hereby constituted and declared to be *negotiable* instruments and securities, (unless it be provided in express terms to the contrary on the face thereof,) in the *same sense* as bills of exchange and promissory notes, and full and complete title to the property in said instruments mentioned or described, and all rights and remedies incident to such title, or arising under or derivable from the said instruments, shall enure to and be vested in each and every *bona fide* holder thereof for value, altogether unaffected by any rights or equities whatsoever of or between the original or any other prior holders of or parties to the same, of which such *bona fide* holder for value shall not have had actual notice at the time he became such." This statute is more comprehensive and sweeping in its phraseology and effect, than the statutes of Missouri and Pennsylvania recently construed by the Supreme Court in the case of *Shaw & Essey vs. Merchants' National Bank of St. Louis,* reported in *The Legal Intelligencer* of March 26th, 1880. In that case a bill of lading for cotton was stolen from the bank during the transit of the cotton from St. Louis to Philadelphia, and endorsed over to parties who advanced $8500 thereon, and the jury found that when these parties received it, they knew facts from which they had reason to believe that the parties from whom they took it, were not the lawful owners of it,

and had no right to dispose of it, and the question was whether, under these circumstances, the endorsees acquired a good title to the cotton, as against the bank which held the bill of lading to secure the payment of an accompanying discounted time-draft. The statutes of Missouri and Pennsylvania were relied on by the endorsees, which declared that bills of lading "shall be negotiable by written endorsement thereon, and delivery in the same manner as bills of exchange and promissory notes." As to these statutes the Court, speaking by Mr. Justice STRONG, decides that each of them simply prescribes the *manner* of negotiation, *i. e.* by endorsement and delivery, but neither undertakes to define the *effect* of such transfer; and then, in a very conclusive argument, proceeds to show that it was not the purpose of these laws by thus declaring bills of lading to be negotiable by endorsement and delivery in the same manner as bills of exchange and promissory notes, to totally change the character of such instruments and put them in *all respects* on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. The Court, therefore, determines that the rule asserted in *Goodman vs. Harvey*, 4 *Ad. & Ellis*, 873; *Goodman vs. Symonds*, 20 *How.*, 343; *Murray vs. Lardner*, 2 *Wallace*, 110, and other similar cases, is not applicable to a stolen bill of lading, or at least, that the purchaser of such a bill with reason to believe that his vendor was not its owner, or that it was held to secure the payment of an outstanding draft is not a *bona fide* purchaser, and is not entitled to hold the merchandise covered by the bill against its true owner.

But, as we have seen, the terms of our statute are different and more comprehensive in scope and purpose. Shortly before this law was passed it had been decided by this Court in the case of *Balt. & Ohio R. R. Co. vs. Wilkens*,

44 *Md.*, 27, that the law does *not* regard bills of lading "as negotiable in the same sense in which a bill of exchange and promissory note is so," and the Legislature, using the very language of this decision, declares they *shall be* negotiable instruments and securities, "in the same sense as bills of exchange and promissory notes." The Act thus affirms that hereafter such instruments shall be what the Court, in view of the then existing law declared they were not, and then in very explicit terms provides that the effect of their negotiation or transfer shall be to vest the *title* to the property mentioned in them in every successive *bona fide* holder for value *wholly unaffected* by any rights or equities between the original or any other prior holder of which he had not actual notice at the time he received them. This is a very different thing from merely prescribing that the *manner* of their negotiation shall be by endorsement and delivery. The present case, however, does not require us to construe or give effect to this statute, save in one or two particulars, and does not raise the question presented in the case decided by the Supreme Court. The only question relating to this Act we now propose to decide is this: It has been argued by the appellant's counsel that the bills of lading in this case were received by the appellee in payment, or were made use of by him to pay, an *antecedent debt* due him by the party from whom he received them, that an antecedent debt is not sufficient to constitute a purchase for value of a chattel, while it is as respects a promissory note, and he insists the statute has not so changed the law as to place bills of lading, which are mere symbols of the possession of property, on the same footing with notes in this regard. But assuming the facts to be as stated, we are clearly of opinion the statute has effected such change in the law, and that a party receiving a bill of lading in payment of an antecedent debt becomes a purchaser and *bona fide* holder thereof for value as

effectually as if it had been a bill of exchange or promissory note.

Having thus disposed of this preliminary question, raised in argument rather than directly presented by any of the rulings of the Court to which exceptions were taken, we now proceed to consider those rulings, and this necessitates a brief statement of the main facts of the case.

Earnest Waltjen, trading under the firm name of "John Campsen & Co.," did business in Charleston, South Carolina, as a miller, grain dealer and commission merchant. The appellant (the plaintiff below) was a flour merchant in St. Louis, and James Knox, the defendant and appellee was a commission merchant in Baltimore, trading under the firm name of James Knox & Co. There had been for some time business dealings between Campsen & Co. and Knox & Co., and among other transactions of a similar character there was a draft for $1803.75 drawn by Knox & Co. to their own order, and accepted by Campsen & Co., which fell due on the 19th of September, 1878, and this draft Knox & Co. had endorsed and procured to be discounted by the Citizens' National Bank in Baltimore. About the 9th or 10th of September, 1878, Campsen & Co. purchased a lot of flour from the plaintiff, through one West, the plaintiff's agent in Charleston, to be shipped to Charleston *via* Baltimore, subject to the order of Campsen & Co. and about the same time also purchased other flour from other parties in St. Louis to be shipped in the same way. The reason assigned for shipment by this route was that Campsen & Co. had made arrangements with the Merchants' Steamship Company running between Baltimore and Charleston, (in which Waltjen appears to have been interested) for a deduction on freight when they received a certain amount of goods to be shipped by one steamer. The plaintiff and the other parties in St. Louis shipped the flour by rail consigned to Campsen & Co., Baltimore, and forwarded to

them the bills of lading therefor. On the 16th of September Campsen & Co. wrote from Charleston to Knox & Co., in Baltimore, a letter enclosing bills of lading endorsed by them in blank for 500 barrels of flour from St. Louis, and directed them to hold the same for the writers' account, as they were not able to get through freight *via* the Baltimore steamers at present, and they then add: "This flour should be there when you receive bills of lading; so please attend to it at once. We may draw on you for amount to pay our draft due 19th inst., and if not, take same up and charge to our account." Upon receipt of this letter with the enclosed bills of lading Knox & Co. paid and took up the draft due on the 19th as requested. On the 20th, Campsen & Co. wrote another letter to Knox enclosing a bill of lading endorsed in the same way for 200 barrels, thus making 700 in all, and in this they direct him, if he could not ship the flour to them at 15 cents per barrel, to hold it for their account, or ship it to a good market, or, if he thought best, to sell it in Baltimore, but not at a loss, and place the net proceeds to their credit. The flour began to arrive in Baltimore on the 18th, and on the 22nd the last of it was received. Knox tried to sell it in Baltimore without success and was unable to forward it to Campsen & Co. at the rate they named. He then, on the 24th, shipped it to Liverpool, and drew a draft on the consignees with a bill of lading attached, which he had discounted, and the proceeds of which he received and retained. After this he was informed by a letter from Campsen & Co. dated the 25th, of their failure, and on the 27th he received telegrams from the plaintiff and the other parties in St. Louis, to hold the flour subject to their order, as it had not been paid for and they had been defrauded. To the telegrams he replied that the flour came regularly to his hands and had been shipped to Europe; that Campsen & Co. owed him over $6000 and he should retain the flour or its proceeds

against that indebtedness.  The proceeds of the flour bought from the plaintiff were not sufficient to pay the draft which fell due on the 19th of September, and which was taken up by Knox on that day.  It is further shown that Knox also paid other acceptances of Campsen & Co., subsequent to the 27th of September, for amounts in excess of the value of all the flour.  The purchases of the flour by Campsen & Co. were upon a credit of thirty days, and they never paid for it.  Evidence was also offered by the plaintiff tending to show that Campsen & Co. were insolvent and knew they were so, at the time they made these purchases, but we do not find in the record any evidence legally sufficient to establish the fact that Knox knew of their insolvent condition, or had any reason to suspect it, prior to the shipment of the flour to Europe. Before the suit was instituted the plaintiff demanded the flour from Knox and he refused to deliver it, and then, on the 21st of December, 1878, the plaintiff brought this action of *trover* to recover damages for its conversion. After the testimony was closed four instructions were asked by the plaintiff all of which were rejected, and one by the defendant which was granted.

The plaintiff's first and second prayers proceed upon the theory, and assert substantially the proposition that no title passed if Waltjen was insolvent and knew himself to be so, and had no reasonable expectation to pay for it, or did not intend to pay for it, when he purchased the flour, received the bill of lading and endorsed and sent it to Knox, and if the jury find these facts then the plaintiff is entitled to recover, notwithstanding they may further find that Knox, on the faith of this endorsement of the bill of lading and receipt of the flour, paid the draft due on the 19th of September, and now holds the other drafts on Campsen & Co., given in evidence.  It seems to us very clear there was no error in rejecting these prayers.  As we have already said, the fact that Knox may have re-

ceived the bill of lading and applied the merchandise covered by it in payment of this draft, even assuming it to. have been an antecedent debt due to him by Campsen & Co., did not prevent his being a *bona fide* purchaser of the bill for value ; and to hold that under these circumstances no title to the flour passed to Knox, though he had no notice of the insolvency of Waltjen, or of any fraud or attempted fraud on his part in effecting the purchase, and in no way participated therein, is a proposition which the terms of the Act of 1876 forbid us to entertain.

The plaintiff's third and fourth prayers in effect place his right to recover upon the ground that there was a combination between Knox and Waltjen to purchase the flour and apply the proceeds of it to pay the acceptances of Campsen & Co., held by Knox, and thus to cheat and defraud the plaintiff. But the defect in these prayers is that there was no evidence in the cause to prove, or, in the legal sense of the terms, "tending to prove" any such fraudulent combination or conspiracy. We have carefully examined the record and can find therein no testimony "*legally sufficient*" to sustain the alleged fact of such combination, and hence there was no error in the rejection of these prayers.

Nor do we find any error in the instruction granted at the instance of the defendant. It asserts that if the jury find that the defendant received from Campsen & Co. the letters of the 16th and 20th of September, and that the bills of lading for the flour in controversy, endorsed by Campsen & Co., were transmitted to the defendant by these letters, and that the defendant had been the holder and owner of the acceptance of Campsen & Co., due on the 19th of September, mentioned in the letter of the 16th, and before the receipt of that letter this acceptance had been discounted by the Citizens' National Bank and endorsed by the defendant, and was then the property of that bank, and that in accordance with the request in that

Tiedeman *vs.* Knox.

letter the defendant paid this draft to the bank on the day of its maturity and before he received any demand or notice from the plaintiff, and that the amount of this draft has never been repaid to the defendant, then the plaintiff is not entitled to recover.

The Court was also clearly right in rejecting the testimony to which objection was made by the defendant. So much of this testimony as appears in the record was hearsay and altogether inadmissible.

We have thus disposed of the case without reference to the question raised by the appellee's counsel in argument, whether under the circumstances *trover* was the proper form of action. In the view we have taken of the case it becomes unnecessary to decide that question.

*Judgment affirmed.*

(Decided 2nd June, 1880.)