## CIRCUIT COURT OF BALTIMORE CITY

Filed February 13, 1891.

———

LINDSAY T. WATERS AND FRANCES C. TALIAFERRO
VS.
MARY McKIM AND CHARLES J. BONAPARTE.

———

FRANCES C. TALIAFERRO
VS.
MARGARET T. McKIM AND CHAS. J. BONAPARTE.

———

PHELPS, J.—

Each of the above is another of those distressing cases in which one of two innocent parties is to sustain heavy loss through the fraud of a third. By agreement they were tried and are to be disposed of together.

Without entering into some of the questions ably discussed at bar, such as the particular scope of Veazey's

agency for the respective parties, and the tracing of the fund to the defendants' use, and assuming, but not deciding, that he was equally the representative of all parties, and that the fund was embezzled to his own use, there are well-settled principles of justice, aside from those considerations, generally found decisive of this class of cases. The principles referred to are substantially one, variously expressed according to the varying circumstances of different cases. The forms in which the rule appears to have been most frequently stated and applied, both in law and equity, are as follows:

That one of two innocent persons should suffer the loss who has most trusted the guilty third party; 50 Md. 106; 44 Md. 29; or, whose negligence enabled him to commit the fraud; 70 Md. 460; 64 Md. 355; 130 U. S. 425; or, who, by reasonable care could have protected himself; 100 U. S. 643, 33 Ch. D, 1; or, whose conduct has misled the other; 31 Md. 548; 42 Md. 391; 43 Md. 324; 44 Md. 559.

In the light of these principles the few material facts may readily be sifted from this voluminous record.

The essential root-fact out of which this controversy grows is the untrustworthiness of Veazey. That is a proposition to which all parties can agree. It is equally certain that, at the critical period, the plaintiffs were profoundly ignorant of this fact, while the same can by no means be said of the defendants. To what extent they were aware of it, and how long before the autumn of 1882, when the transactions in suit occurred, will sufficiently appear from their own testimony:

"In December, 1881, my sister and I, being entirely dissatisfied with Mr. Veazey's management, and feeling that we could not keep pace with him and his actions, took our business out of his hands entirely. * * * He knew that we had no confidence in him; he felt it." The witness then mentions an incident in the spring of 1881, and adds: "My sister and I lost entire confidence in him, and from that day to this, naturally, we have never had any dealings with him that we could possibly avoid. We saw from his lack of truthfulness and his want of faithfulness in his statements that he was not acting as he should do." Are you not mistaken in supposing that you had entirely withdrawn all confidence in Mr. Veazey as early as the spring of 1881?" "No, I am not mistaken." M. T. M., 74th Cross, ib.

The sister was present when this proof was taken, and in her own testimony emphatically confirms it. "I lost all confidence in him and avoided him in every way." M. R. M., 1st Cross, 78th ib., 81st ib.

Unfortunately, notwithstanding their timely discovery of what was then a great secret to the plaintiffs as well as to the world, that is to say; the true character of this man Veazey, it did not occur to the defendants to act upon their knowledge as occasions afterwards arrived. The first opportunity was offered when the message came to them from Veazey in August, 1882: "Tell Cousins Mary and Margie, that I am trying to change this mortgages $12,000 each, you know, from 6 per cent. to 5 per cent. loans, with little or no expense to them. If I succeed, will send on papers early next week."

Inasmuch as the mortgages referred to were those held by the plaintiffs and had some time to run, and the change indicated could only be effected with their consent, it was quite evident from this message that Veazey was in communication, or about to be in communication with the plaintiffs, professedly in the interests of the defendants and for their especial accommodation, endeavoring to obtain from the plaintiffs a concession of some sort for the relief of the defendants. Upon the receipt of this information, the defendants did not send word to Veazey that they had long since repudiated his agency and would therefore decline his officious intervention. Nor did they cause the plaintiffs to be cautioned that in any approach of Veazey to them professedly in defendants' interest, the plaintiffs should be on their guard. They did and said nothing, and as a natural consequence things went on until the letter of 31st October, 1882, was received from Veazey, which is so remarkable for its statements and mis-statements that it is quoted at length:

"You may perhaps remember that in one of my letters to Aunt McKim, while you were in Asheyville, I mentioned the fact that I was trying to change your mortgage of $12,000, and that of Cousin Mary from a 6 per cent.

loan to a 5 per cent. loan, and that if I succeeded I would send to you the necessary papers. At that time I applied to Mr. John Curlett, one of the officers of the Central Savings Bank (with whom I then had some business matters pending), and was promptly assured by him that the bank would gladly take the loans at 5 per cent. I accordingly wrote to Arthur George Brown, the counsel for the bank, and asked him whether he would consider any extensive search of title necessary and whether he could facilitate an early consummation of the loan; he was then at Bedford, and he telegraphed his partners here to accept the title upon my assurance that it was clear.

"I accordingly prepared a release of mortgage from Mrs. Waters and one from Miss Taliaferro, which were accordingly executed and recorded early in September and other arrangements made for their funds. To my utter amazement I was informed, after all this had been done, that Mr. Francis T. King, another one of the bank officers, objected to the investment and the bank accordingly declined the loan. Your property has been from that time to this free from mortgages altogether, and as other arrangements had been made for these ladies' funds, I have submitted the matter to Mr. Bonaparte and he has agreed to take the loan at 6 per cent.—having meanwhile tried in vain to place the loans at 5 per cent. I have agreed to let him have them at 6 per cent. This will involve no additional expense, except the recording of those new papers and as that results from my blunder, though unavoidable and unintentional, I think I ought to pay it. If you can send me word by bearer what hour it would be convenient for you to have Mr. Graff, the magistrate, to call, I will instruct him and will send the papers by him. I enclose the releases to which I have referred so that you can see the date when all this happened.

Affect.,—I. Parker Veazey."

This letter contained the important information that Veazey, in pursuance of the scheme he had foreshadowed several months before, had gone so far as to have obtained from the plaintiffs, and actually placed on record, releases of defendant's mortgages, without con-sideration. In view of their experience of his untruthfulness, it was scarcely prudent in the defendants to place implicit reliance in his vague assurance that he had made "other arrangements" for the plaintiffs' funds. They were content to take this statement without asking him to explain these "arrangements," and without resorting to the plaintiffs to verify the information. In point of fact, Veazey had obtained these releases from the plaintiffs upon the explicit engagement that they should have equivalent mortgages upon property of defendants' brother. A frank word of communcation at that time from the mortgage debtors to their creditors would have made impossible the impending disaster. They would have been referred to their brother, and upon comparing notes with him the attempted fraud would have been at once exploded.

It is true that there was a downright air of frankness in that part of the letter admitting the writer's "blunder," and conceding his liability for the expense thereby caused, which might have deceived a stranger, but the defendants had experienced Veazey's crookedness before, and if they had only taken the trouble to reflect would have seen clearly exactly what all this affectation of candor was for. The premature recording of the releases was an uncalled for step, even on his own premises, and a signal departure from the ordinary course of business in such cases. Here was an extraordinary and suspicious circumstance in itself, and when taken in connection with their knowledge of the man, plainly sufficient to put the defendants upon inquiry.

But the effective negligence we have to deal with here was not one of mere silence or omission. They went further and took the fatal step of entrusting this discharged and faithless agent, in whom they had lost all confidence, with their new notes and mortgages to a new mortgagee to be cashed. The execution of these new notes and their surrender to Veazey was attended by more than the usual deliberation and opportunity for reconsideration. It appears that Veazey sent back the notes for correction, and the defendants corrected them and forwarded them to Veazey a second time.

C. J. B. 2nd Int. Rec. 46.

As between them and the plaintiffs, this act of theirs must be regarded as the proximate cause of their loss.

The $24,000 obtained by Veazey from the new lender upon these new securities was the money of the defendants, placed by them, in effect, in the hands of their agent for the purpose of paying their debt to the plaintiffs. Violating the confidence thus rashly reposed in him by the defendants, he misapplied the money, and loss naturally falls upon the defendants as their money, misapplied by their agent, leaving them in the position of mortgage debtors whose mortgages have been fraudulently released without consideration, and who are still liable to their unpaid creditors.

The only way of escaping this conclusion is by assuming a transfer by operation of law from Veazey as the defendants' agent to Veazey as the plaintiffs' agent, to instanti, he received the money. Without stopping to inquire whether, as a general rule, such transfer would be necessarily implied (see Scott vs. State, 2 Md. 289), and waiving also the controverted question of whether it was within the scope of Veazey's limited agency for the plaintiffs to receive the money on their mortgages, it is elementary equity that such presumptions are only allowed to subserve the purposes of justice upon the principle that equity regards as done what ought to have been done, and will not be allowed to prejudice innocent parties, ignorant of the situation and its perils, in order to relieve negligent parties, voluntarily comprising themselves with knowledge of the risk. That is distinctly one of those things which ought not to be done, and is therefore not one of the things which equity will presume to have been done.

The learned counsel for defendants relies on the actual exhibition of these releases as showing the implicit confidence of the plaintiffs in Veazey, as if that was the cause of the defendants afterwards entrusting Veazey with their new mortgages. But it has already been seen that the defendants knew this man much better than the plaintiffs did, and cannot claim to have been misled by that fact that he had succeeded in some way in getting hold of these releases. Veazey was not a magician to obtain honest cancellation of his own or other people's debts without payment; the defendants well knew that the money to represent those releases had never been paid by them, and that it was to be raised by these new loans, and they were fairly put upon inquiry to ascertain from some reliable source other than the man whom they knew not to be reliable, the exact nature of the operation by means of which the releases had been captured. As already stated, such a source of information was readily accessible, but they unfortunately failed to avail themselves of it, and fell into the trap which the scamp had artfully baited first with the flattering prospect of reducing interest, and finally with those fraudulently obtained releases.

The defendants as has been seen, entrusted Veazey with their securities to be cashed, and thus in effect trusted him with their money. After furnishing this new and striking proof of their recognition of Veazey as their agent, and still allowing the plaintiffs to remain in the dark as to his real character, as they knew it, they cannot now in reason complain if the plaintiffs, having themselves no cause for suspicion, and moreover lulled into security by Veazey's payments of interest as and for the interest upon pretended new loans, omitted to take precautions which they would have omitted at their peril, had they been put upon inquiry, if they failed to require Veazey to produce his fictitious securities, or even if they entrusted him with their imaginary custody.

A party having the means of knowledge is in general and properly chargeable with constructive notice, but unless there be something special to excite suspicion, this rule does not require a party to act upon the assumption that every person with whom he deals is likely to be a knave.

Re Vernon, 33 Ch. D. 410.

Bank vs. Kent, 36 Ch. D. 248.

Kilbourn vs. Sunderland, 130 U. S. 519.

To sum up: The plaintiffs appear to have acted according to the lights they had, and no loss could have happened of the defendants had acted according to theirs.

It results that the plaintiffs are entitled to the relief prayed, cancellation of releases, enforcement of mortgages, *in rem* and *in personam*, all rights of the co-defendant Bonaparte, as a bona

fide encumbrancer without notice, being of course reserved.

It will be observed that the material for this decision has, with commendable frankness, been mainly furnished by the defendants against themselves. In view of this circumstance, and of the apparent hardship of the case, it will be for the plaintiffs to consider, a matter altogether beyond the Court's control, the extent of the claim that these ladies may have upon their substantial sympathy.

See 63 Md. 93, 26 Ch. D. 537, 38 Ch. D. 643.