THE WESTERN MARYLAND RAILROAD COMPANY *vs.*
THE FRANKLIN BANK OF BALTIMORE.   SAME *vs.*
STEIN BROTHERS.   SAME *vs.* CHARLES ROUS.

*Principal and agent—Liability of Corporations for the Fraud
of their Agents.*

Strictly speaking, corporations, while acting within the scope of the
powers delegated to them, cannot be guilty of wilful fraud; yet it
is settled by a great number of decided cases, that corporations
carrying on trade or business of any kind, are equally, and to the
same extent, liable for the frauds and wrongs of their agents, per-
petrated in the course of their employment, as individual princi-
pals would be under like circumstances.

A railroad company provided certain blank certificates to be used in
funding its overdue mortgage coupons, and to be issued to the hold-
ers of such coupons desiring to fund them.   These certificates con-
tained the terms of the funding scheme, and stated that the coupons
for which each certificate was given were placed in the custody of
the Safe Deposit and Trust Company of Baltimore, as the property
of the holder of the certificate, to be held by it in accordance with
the terms stated.   Such certificate was required to be duly signed
by the president of said company, and attested by the signature
of the secretary under the seal of the corporation.   Attached to
the certificate was a schedule of the coupons, under which was a
receipt to be signed by the treasurer of the Safe Deposit and Trust
Company of Baltimore.   There was a book of these printed forms,
from which all the certificates were taken, and there was a stub to
correspond with each certificate, showing the party to whom the
certificate issued, the number of the coupons, with their amounts,
and other description; and which was required to be signed and
sealed by the depositor of the coupons; and which receipt con-
tained an assignment in these words: "And I hereby assign to the
persons who may be the bearers of the said certificate, the said
coupons, and my liens and remedies upon the same."   J. S. H., Jr.,
was a regularly employed clerk in the office of the railroad com-
pany, his father being its treasurer.   During the absence of the
treasurer his son was charged with the duties of refunding the

Western Maryland Railroad Co. *vs.* Franklin Bank of Baltimore.

coupons, and especially charged at all times during his employment, with the duty of receiving coupons from the holders, and issuing to them refunding certificates for the same. His regular course of proceeding was to receive the coupons and take them, together with a certificate regularly signed and sealed, filled up with the number and description of the coupons, to the Safe Deposit Company, and procure the signature of that company to the printed receipt at the foot of the schedule of coupons; and deliver the certificate thus signed to the owner of the coupons, upon the latter signing the receipt and assignment in the certificate book at the office of the company. Certain of said certificates duly signed by the president and treasurer of the company, and with the corporate seal of the company attached by the treasurer, were left with J. S. H., Jr., with the knowledge and assent of the president, to be filled up and used by him in the usual manner, during an anticipated prolonged absence from the office, of the president and treasurer. Three of said certificates, instead of being properly used, were falsely and fraudulently filled up, the name of the treasurer of the Safe Deposit Company forged to the receipts, and the certificates disposed of by the clerk. Such like certificates were, at the time, being regularly bought and sold in the money and stock market of Baltimore, and were treated, by those dealing in them, as passing title by delivery. The three fraudulent certificates were acquired from J. S. H., Jr., in a regular course of business, *bona fide*, and for value; the parties so acquiring them being ignorant of the fraud and forgery, and without suspicon; but they all knew that J. S. H., Jr., was in the employ of the railroad company, and they all knew the nature and scope of his employment. HELD:

1st. That it was within the employment, and scope of the duties of J. S. H., Jr., to act officially as the agent of the railroad company, in receiving coupons, and filling up and supplying certificates to the owners or depositors of such coupons.

2nd. That when he issued such certificate and delivered it to a third party, who acted without knowledge and in good faith, paying value for it, such party had a right to act upon the presumption that the representations of such certificate were truthful, and not false and fraudulent.

3rd. That, having confided to him the special trust of executing that business, the agent was held out to the public as competent, faithful, and worthy of confidence; and though he deceived both his principal and the public, by forging and issuing the false cer-

tificates, it was but reasonable that the principal who placed him in the position to perpetrate the wrong should bear the loss.

4th. That the facts that the certificates happened to be in the hands of a party who was an agent of the company, or that they happened to represent on their face that the coupons had been deposited by such person, were not sufficient of themselves to discredit the certificates, or to require of innocent third parties to act upon the presumption that they were false and fraudulent.

This case distinguished from the case of *The Baltimore and Ohio Railroad Co. vs. Wilkins*, 44 *Md.* 11.

APPEALS from the Court of Common Pleas.

These cases are stated in the opinion of the Court.

The causes were argued before MILLER, YELLOTT, STONE, ALVEY, and IRVING, J.

*Thomas W. Hall*, for the appellant.

*John J. Donaldson*, and *Wm. F. Frick*, for the appellees.

ALVEY, J., delivered the opinion of the Court.

These three appeals have been heard together, as they present nearly a similar state of facts, and give rise to substantially the same questions.

The agreed statement of facts in each case, upon which the trials below were had, refers to and adopts, so far as relevant, the statements filed in the other two cases. We shall, therefore, treat the three cases together and as one, only noticing as we pass any material facts that may distinguish the one case from the others.

The actions were brought by the several plaintiffs below to recover of the defendant in respect of certain fraudulent coupon deposit certificates issued from the office of the latter, and which were purchased by the

former in a regular course of business, *bona fide,* and without notice. In the submission of the cases to the Court below, it was agreed that, upon the facts stated, the Court should decide whether the defendant was liable in damages or otherwise; and that if, on any state of pleadings, *on the facts stated,* the plaintiffs should be entitled to recover, judgments should be entered for the plaintiffs, with the right of appeal. And the opinion and judgment of the Court being in favor of the plaintiffs, the defendant appealed in each case.

By the agreed statements of fact it is made to appear, that the defendant, in the year 1880, and for some time before, was in default in the payment of the coupons on its first mortgage bonds, and its second preferred stock. Some years before the year 1880, the company had funded such over-due coupons at 8 per cent.; and the time for which such funded certificates ran expired July 1st, 1880. The company still being unable to redeem and take up such certificates by payment, determined to *refund* them, and the method of such refunding was devised by the company, according to a plan of its own, and not that of the holders of the funded certificates of over-due coupons. The rate of interest on the refunded certificates was six per cent. per annum; and the certificates issued by the company were of uniform tenor and representation. That certificate was in this form: "Western Maryland Railroad Company. No. —— This certificate witnesseth, that in consideration of——— having, at the request of the Western Maryland Railroad Company, this day placed in the custody of the Safe Deposit and Trust Company of Baltimore, the coupons of said railroad company, below stated, as the property of the holder of this certificate, until January 1st, 1890, upon the understanding, that the coupons will then be delivered to said company, if it shall have paid the said certificate, and interest meanwhile, at the rate of six per cent. per annum, on the first day of

January and July, in each year, on the amount stated in this certificate, on presentation of the same at the office of the treasurer of said railroad company, in the City of Baltimore; but that if said company shall make default in payment of interest, or of the principal, at the times and in the manner aforesaid, the holders of the funding certificates may, at once, deliver up the funding certificates and reclaim the coupons so placed in escrow: Payments of interest, when made, to be endorsed on the certificate by the treasurer of said company.

"In witness whereof, J. M. Hood, the president of said company, has subscribed his name, and caused its corporate seal to be hereto affixed, and attested by its secretary.

"Attest: ——— ———              President."
                    Secretary."

Such certificate was required to be duly signed by the president of the company, and attested by the signature of the secretary, under the seal of the corporation. Attached to the certificate was the schedule of the coupons, giving the numbers of the bonds, their issue, the amount of coupons, and the aggregate amount thereof, in different columns. And under which schedule was a receipt to be signed by the treasurer of the Safe Deposit and Trust Company of Baltimore. This certificate was the regular form prepared by the company, to be issued to any and all holders of the over-due coupons; and it is the exact form of the certificates involved in this case. There was a book of these printed forms, from which all the certificates were taken, and there was a stub to correspond with each certificate, showing the party to whom the certificate issued, the number of the coupons, with their amount, and other description; and which was required to be signed by the depositor of the coupons; and which receipt was in this form:

Western Maryland Railroad Co. *vs.* Franklin Bank of Baltimore.

"I have received certificate No.——, which is a copy of the printed form, at the beginning of this book, with my name, and the description of my coupons inserted, my said coupons being as follows; (then follows a descriptive table of the coupons, with numbers, amounts, &c.) And I hereby assign to the persons who may be the bearers of the said certificate, the said coupons, and my liens and remedies upon the same.

"Witness my hand and seal.

"Witness :——  ——— [SEAL.]"

It is agreed that it was the custom of the company, in paying the interest on all certificates, admitted by it to be genuine, to pay the same to the bearer of the certificate, without requiring any other written assignment from the person in whose name the certificate was issued, than that on the stub in the certificate book. As matter of fact, all the owners of genuine certificates, signed the receipt and assignment to bearer on the stub, according to the form already recited.

It appears, from the agreed statement of facts, that John S. Harden, Jr., was a regularly employed clerk in the office of the company, and was principally employed in the office of the treasurer,—his father being the treasurer of the company. It is shown that during the absence of the treasurer, young Harden was charged with the duties of refunding the coupons, and especially charged at all times during his employment, with the duty of receiving from holders of coupons, who wished to refund the same, such coupons, and the issuing to them the refunding certificates for the same. The regular course and manner of his proceeding would appear to be this: He would receive the coupons to be refunded, and he would take them, together with a certificate regularly signed and sealed, filled up with the numbers and description of the coupons, such as has already been described, to the Safe Deposit

Company, and upon depositing the coupons, he would procure the signature of the treasurer of that company to the printed receipt at the foot of the schedule of coupons; and this certificate, thus signed, he would deliver to the owner of the coupons, upon the latter signing the receipt and assignment in the certificate book, at the office of the company.

It appears that during the fall of 1880, both the president and the treasurer of the company were necessarily absent from the office for some time, but in order that the refunding of the coupons might not be delayed, the president, in the first place, signed the certificates in question and others like them, and afterwards the treasurer signed and duly sealed the same with the corporate seal, and left them with young Harden, the clerk, to be filled up and used in the usual and ordinary course of the business; and this was with the knowledge and by the assent of the president. But the certificates in question, instead of being properly used, were falsely and fraudulently filled up, the name of the treasurer of the Safe Deposit Company forged to the receipts, and the certificates disposed of by young Harden to the plaintiffs. One of these fraudulent certificates was filled up as for coupons deposited by Samuel McKinstry, and which was a duplicate of a genuine certificate issued to McKinstry; but both the other certificates were issued as for coupons deposited by John S. Harden, Jr., when in fact he had deposited no such coupons as represented in either of the certificates; and the stubs in the certificate book from which all three of these certificates were taken were left blank. It is admitted that the numbers of the bonds and preferred stock recited in the certificates are within the numbers of the company's issue; and it is also admitted that while the certificates were in fact signed and sealed by the regular and proper officers of the company, to be used in the business of refunding the coupons, the signature to the receipts of

the treasurer of the Safe Deposit Company on each of the certificates was forged by young Harden.

It is further admitted that such like certificates, as those in question were, at the time, being regularly bought and sold in the money and stock market of Baltimore; and that they were treated, by those dealing in them, as passing title by delivery. It is agreed that the plaintiffs in the several cases acquired the certificates from John S. Harden, Jr., in a regular course of business, *bona fide*, and for value; they being ignorant of the fraud and forgery, and had no ground of suspicion; but they all knew that young Harden was in the employ of the defendant, and they all knew the nature and scope of his employment. The fraud was not discovered until shortly after the death of the author of it, which occurred on the 4th of January, 1881; whereupon both the defendant and the Safe Deposit Company refused to honor or adopt the certificates.

On these facts, as between these plaintiffs and the defendant, the general question is, who ought to suffer the consequences of the fraud?

Strictly speaking, corporations while acting within the scope of the powers delegated to them, cannot be guilty of wilful fraud; yet it is settled by a great number of decided cases, that corporations, carrying on trade or business of any kind, are equally, and to the same extent, liable for the frauds and wrongs of their agents, perpetrated in the course of their employment, as individual principals would be under like circumstances. This principle was very broadly maintained and applied by this Court in the case of *Tome vs. The Parkersburg Branch R. R. Co.*, 39 *Md.*, 36, and the doctrine there enunciated must, to a large extent, control in the decision of this case.

In that case the authorities were extensively examined, and in support of the conclusion reached, both text writers and decided cases were largely quoted. Prominent among the authorities quoted and fully adopted by the Court as

correctly expounding the law, was the section 452 of the work of Judge STORY on the law of Agency. In that section of his work the author lays it down as the settled law, that the principal "is held liable to third persons, in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty of his agent, *in the course of his employment*, although the principal did not authorize, or justify, or participate in, or indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. In all such cases the rule applies, *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case, the principal holds out his agent as competent, and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."

This is a fair summary of the law upon the subject, and is abundantly supported by the authorities cited.

The case of *Hern vs. Nichols*, 1 *Salk.*, 289, often referred to as an authority, furnishes a good illustration of the doctrine just stated. That was an action for deceit; and it appearing that there was no actual deceit on the part of the defendant, the merchant, but that it was the fraud and deceit of his factor beyond sea, the question was raised whether the defendant, an innocent party, could be held liable. And Lord HOLT held that the defendant was liable; for, as he said, seeing that somebody must be a loser by the deceit, it was more reasonable that he who employed and put a trust and confidence in the deceiver should be a loser than a stranger.

And so in the later case of *Grammer, et al. vs. Nixon*, 1 *Strange*, 653, a case frequently cited in the books, a goldsmith, who had intrusted an apprentice in his shop, the

latter sold an ingot of gold and silver upon a special warranty, that it was of the same value per ounce with an assay then shown. It appeared in evidence that he had forged the assay, and that the ingot was made of a lodger's plate, which he had stolen. Lord Chief Justice Eyre held the master liable for the fraud, on the ground that the apprentice was acting within the apparent and presumable scope of his authority.

In *Tome vs. The Parkersburg Branch R. R.*, 39 *Md.*, 36, a majority of the Court held, that even upon the assumption that Van Winkle's name as president of the company had been forged by the transfer agent, the certificate of stock having been issued by such agent in the apparent regular exercise of the authority delegated to him, the company was liable. It was upon that assumption and principle that the majority of the Court held it to be error in the Court below in not granting the second and third prayers offered by the plaintiff in that case.

In the present case, there can be no question but that it was within the employment and scope of duties of young Harden, to act officially as the agent of the defendant, in receiving coupons, and filling up and supplying certificates to the owners or depositors of such coupons. In the absence of the higher officials of the company, he was the sole representative of the latter in respect to that particular business. The printed, formal certificates, ready signed and sealed, were placed in his keeping, to be used when required; and the usual and ordinary course of the business was such, that when coupons were received to be refunded, he filled up the certificates, and took the same, with the coupons, to the office of the Safe Deposit and Trust Company, and procured the signature of the treasurer of that company to the receipt attached to the certificates. The filling up the certificates, and procuring the signature to the receipts thereto, were strictly within the regular course of his employment, and required his

active agency from the beginning to the completion of the transaction. The certificates thus procured and delivered were his representations, as to the reality and genuineness of the transactions, as expressed on the face of the certificates. And when he issued such a certificate and delivered it to a third party, who acted without knowledge and in good faith, paying value for it, such party had a right to act upon the presumption that the representations of such certificate were truthful, and not false and fraudulent. Having confided to him the special trust of executing that business, the agent was held out to the public as competent, faithful, and worthy of confidence ; and though he deceived both his principal and the public, by forging and issuing the false certificates, it is but reasonable that the principal who placed him in the position to perpetrate the wrong should bear the loss.

It is said that the agent was not employed to issue such fraudulent certificates, or any certificates at all, without the actual deposit of the coupons described, and the genuine signatures of all parties required to sign the certificates, and therefore his acts in respect to the certificates in question ought not to bind the company. But that is not the exact way to state the relation of the parties, and the consequent liability of the one for the acts of the other.

It may be conceded, and was doubtless the case, that the agent had no authority in fact to issue such certificates; he had no real authority as between himself and his principal, or other parties conusant of the facts, for doing the particular acts complained of. But the company, by its own act and, as it turned out, misplaced confidence, placed the agent in position to do, and procure to be done, that class and description of acts to which the particular acts in question belong; and in such case, where the particular acts in question are done in the name of, and apparently on behalf of the principal, the latter must be

answerable to innocent parties for the manner in which the agent has conducted himself in doing the business confided to him. Upon no other principle could the public venture to deal with an agent. In such case the apparent authority must stand as and for real authority.

It is supposed that the facts that the agent issued these false and fraudulent certificates for his own purposes, and disposed of them himself, and that in two of the certificates the representation was that he was the depositor of the coupons, were sufficient to put purchasers or dealers on inquiry, and to deprive them of the position of being *bona fide* purchasers without notice. But to this we cannot accede.

In the first place, it is distinctly admitted that the plaintiffs in these actions, took the certificates in the regular course of their business, *bona fide*, for value, and without any notice whatever, *and that they had no ground for suspicion of fraud.* The certificates were dealt in by bankers and brokers, and they were among the securities on the stock and money market of the city. And among those dealing in them, the title was regarded as passing upon delivery. Indeed, it appears to have been designed by the defendant that the holders or transferees of such certificates should be relieved from the necessity of having written transfers made on the books of the corporation, and that the certificate should pass title by mere delivery; for we find that the original parties to whom certificates issued were required to sign a receipt, and also a general assignment to any person who should be holder; and the defendant paid interest to any such holder without other assignment than the original general assignment in the certificate book; regarding that as sufficient. And such being the case, why should parties dealing in such certificates in a regular course of business, without ground of suspicion, be restricted in their right to purchase or advance upon such certificates, because they happen to be

in the hands of a party who is an agent of the company, or because they happen to represent on their face, that the coupons had·been deposited by such person? We can perceive no good reason for such a distinction. Such facts were not sufficient, of themselves, to discredit the certificates, or to require of innocent third parties to act upon the presumption that they were false and fraudulent. It was the right of the party disposing of the certificates, though an agent of the company, to own or acquire coupons or coupon certificates, and it was equally his right as of other people, on the terms proposed by the company, to deposit such coupons and obtain a certificate therefor, in the ordinary form. And if that be so, he certainly had a right to sell such certificate in the market, in the ordinary way. It has been held repeatedly that purchasers of stock are not bound to look beyond the certificate, or to examine the books of the corporation, to ascertain the validity of the transfer (*Lowry vs. Com. & Farm. Bank, Taney U. S. Cir. Ct. Dec.,* 310); and we perceive no reason why the same principle should not be applied to coupon deposit certificates, such as those in question here.

But this question would seem to be entirely concluded by the reasoning and decision in the case of *Tome vs. The Parkersburg Branch R. R. Co.,* 39 *Md.,* 81. In that case, the case of *The N. Y. & N. H. Railroad Co. vs. Schuyler,* 34 *N. Y.,* 30 & 61, and the case of *Titus vs. the President, &c., of The Great Western Turnpike Road Co.,* 5 *Lansing,* 250, were quoted and approved by this Court; and in both of those cases certain spurious and fraudulent certificates of stock were issued by and to the fraudulent agents themselves, and by them disposed of to innocent third parties, to whom the companies were held liable. Unless we depart from the decisions made in those cases, approved by this Court as we have just stated, we must hold that the facts attending the issue and disposition of the certifi-

cates here show nothing that will relieve the defendant from liability. We perceive no reason why a different ruling should be made in this case.

In the argument, on the part of the defendant, the main effort was to distinguish this from the case of *Tome vs. The Parkersburg Branch R. R. Co.*, already referred to; and it was thought and contended that this Court, in the case of *The Balto. & Ohio Railroad Co. vs. Wilkins*, 44 *Md.*, 11, had, by explanation, imposed a limitation or restriction on the case in 39 *Md.*, 36. But the case in 44 *Md.*, 11, was in relation to a fraudulent bill of lading, which certified that goods had been received for carriage, when in fact no such goods had been received by the agent giving the bill of lading. And when that case is carefully examined, it will be found to decide simply that there were certain commercial instruments, such as bills of lading, warehouse and wharfinger's receipts, governed by established principles, that were not intended to be embraced by the rule laid down in the stock case. Such instruments only represent tangible property, actually received by the party giving them, and in commercial transactions are governed and given effect, by principles peculiar to such instruments; and all parties dealing with them are supposed to take them with a knowledge of those principles, and the limitations that such principles impose. It was not the intention, by anything that was said in the Parkersburg stock case, to affect or disturb the well established principles of commercial law that limited or restricted the powers of agents in making instruments of the nature of bills of lading, warehouse receipts, &c.; and hence the case of *The Balto. & Ohio Railroad Co. vs. Wilkins* in no manner conflicted with the previous decision. The case of Wilkins was decided before the Act of 1876, ch. 262, and was, of course, in view of the law as it existed prior to that Act.

After careful examination of the records in these cases our conclusion is, that there was no error in the judgments appealed from, and they must, therefore, be affirmed; and it is so ordered.

*Judgments affirmed.*

(Decided 28th March, 1883.)