HAVENS v. BANK OF TARBORO.

(Filed March 24, 1903.)

BANKS AND BANKING—*Corporations—Stock—Certificates of Stock—
Issuance.*

> Where the president of a bank signs certificates of stock in blank
> and leaves them with the cashier, all the stock having been
> issued, who fraudulently issues such certificates to himself and
> pledges them as collateral for a loan, the bank is liable to the
> pledgee for the value of the stock, although the certificates of
> stock recite that they are transferable only on the stock book of
> the bank.

ACTION by Lucy E. Havens against the Bank of Tarboro
and others, heard by Judge *Francis D. Winston* at October
Term, 1902, of the Superior Court of EDGECOMBE County.

This action was brought by the plaintiff to recover the
value of a certificate for thirteen shares of stock which she
alleged was issued by the defendant to James G. Mehegan,
and which she received from him as collateral security for a
loan of $500. The case was tried in the court below upon
certain facts which were agreed upon by counsel of the parties
and submitted to the court for its decision, the said facts
being as follows:

1. That the defendant bank was organized under act of
General Assembly in the spring of 1895 for the conduct of a
general banking business in Tarboro, N. C.

2. That the defendant bank organized by the election of
John F. Shackelford, President, and the defendant J. G.
Mehegan, Cashier; that said Shackelford has served continu-
ously since then as president, and said Mehegan served as
cashier until the month of October, 1897.

3. That it was provided by the act of incorporation of said
bank that the capital stock thereof should not be less than
twenty-five thousand dollars, in shares of one hundred dollars
each, with authority to increase the same to an amount not

exceeding two hundred and fifty thousand dollars, and that the stockholders therein should have the authority to adopt such by-laws and regulations for the government of said bank as they might deem necessary and proper; that said act of incorporation (chapter .., Private Laws of 1895) .is made part of this agreed state of facts. (The same need not be printed, but the bound volume may be used in the Supreme Court).

4. That the stockholders of said bank thereafter adopted the following by-law and regulation in regard to the issuing of certificates of stock therein, to-wit:

"Certificates of stock signed by the President and Cashier may be issued to stockholders and the certificates shall state on the face thereof that the stock is transferable only on the books of the bank, and when the stock is transferred the certificate thereof shall be returned to the bank and cancelled and preserved, and new certificates issued. But no certificate shall be delivered to any stockholder until his stock is fully paid. Upon the payment, however, of the first assessment of 40 per cent. of said stock the same shall be issued in the name of each shareholder as he shall have subscribed for the same, and retained by the bank until the same is fully paid. There shall be issued to said stockholders a certificate certifying the number of shares of capital stock that said shareholder is entitled to upon a payment of the remaining 60 per cent. of the par value of said stock, which certificate shall state in its face the amount paid on said stock, and shall be assignable and transferable in the same manner as herein provided for capital stock, and shall be signed by the President and Cashier."

5. That the plaintiff had no knowledge of the provisions of the foregoing by-law and regulation other than such as was derived from the certificate of stock assigned to her by James G. Mehegan as hereafter stated.

6.   That John F. Shackelford signed a number of blank certificates like that in question, as president of the bank, to be filled out in the name of the purchaser when called for, and placed them in the safe of the bank, which was under the control of the defendant Mehegan, the bank cashier, to be held as set out in fact 4; that the said Mehegan filled out, signed and issued to himself one of these certificates which the president had previously signed in blank; and that the said Mehegan did this without the knowledge of any other officer of the bank than himself, and without the knowledge of any other person, without having paid the said bank anything for the said certificate.

7.   That on the 22nd day of November, 1895, the defendant James G. Mehegan individually borrowed of the plaintiff the sum of five hundred dollars, and in evidence thereof executed his promissory note for the payment of the same one year after date, with interest payable quarterly, and as collateral security for the payment of the said note the said Mehegan assigned by written endorsement and delivered to the plaintiff the said stock certificate, which, with the endorsement thereon, is in the following language:

Number 10.                                    Shares 13.

### THE BANK OF TARBORO,

TARBORO, N. C.

This certifies that Jas. G. Mehegan is the owner of thirteen shares of the capital stock of

THE BANK OF TARBORO,

transferable only on the books of the corporation in person or by attorney on surrender of this certificate.

In witness whereof, the President and Cashier have hereunto subscribed their names and caused the corporate seal to

be hereto affixed at Tarboro, N. C., this 22d day of November, 1895.

JOHN F. SHACKELFORD,

President.

JAS. G. MEHEGAN,
          Cashier.

That there appeared on the back of said certificate the following entries and endorsements, to-wit:

"This certificate is subject to an assessment of 60 per cent., payable on call of Board of Directors.

JAS. G. MEHEGAN,

Cashier."

"For value received........hereby sell and transfer and assign to.........the shares of stock within mentioned, and hereby authorize. . . . . . . . to make the necessary transfer on the books of the corporation.

"Witness...hand and seal, this ....day of......, 189..

JAS. G. MEHEGAN."

8. That said certificate of stock, assigned as aforesaid, was taken from the stock certificate book of the said bank, and this is the only stock book we had in the bank.

9. That the said loan of five hundred dollars was made by the plaintiff upon the faith and credit of the said certificate of thirteen shares of the capital stock in said bank, and in the full confidence and belief that the said certificate of stock was in all respects genuine and valid, and without notice of any irregularity or fraud in the issuance of the same.

10. That the defendant James G. Mehegan is wholly insolvent.

11. That the plaintiff made demand upon the defendant bank to authorize and effect the transfer of the said certificate of stock upon the proper book of said bank according to its

by-laws, but said bank refused this demand, insisting that this certificate was spurious and void.

12.   That said certificate of stock assigned to the plaintiff by the defendant Mehegan as aforesaid has never been transferred on the books of the bank to the plaintiff.

13.   That the amount due the plaintiff on the note of the defendant Mehegan, for which said certificate of stock was assigned as collateral security, was, on October 27, 1902, $538.63, and the cash value of the said certificate of stock at the time it was assigned to the plaintiff, had it been genuine, was more than sufficient to cover that amount.

Upon consideration of the foregoing facts, together with such allegations in the pleadings as were admitted therein, which were submitted in evidence, the Court rendered the judgment which appears in the record.

The plaintiff excepted to said judgment and appealed, and for error assigns that upon said facts and the pleadings, judgment should have been rendered in her favor against said bank for the value of said stock, to-wit, $538.63 and interest from October 27, 1902.

From a judgment for the defendants, the plaintiff appealed.

*Gilliam & Gilliam,* for the plaintiff.
*John L. Bridgers,* for the defendant.

WALKER, J., (after stating the case) :   It appears in this case that the bank was fully authorized by its charter to issue the certificate of stock in question and that, so far as the face of the certificate shows, it was issued in accordance with the provisions of the charter and the by-laws and regulations.   The plaintiff loaned the money in the faith and confidence that the certificate of stock which had all the appearances of being genuine would constitute a valid and unimpeachable security in her hands for the money bor-

rowed by Mehegan, and we think that, upon well established principles, she had the right to so regard it, and that the Bank must pay to her the value of the stock not exceeding the amount of the debt, although it was in fact issued without the authority and contrary to the Bank's instructions and in fraud of its rights.

The President and Secretary signed several blank certificates and they were then left with the cashier, Mehegan, to be filled out in the name of the purchaser of the stock when called for by them.

The fact that they were signed by the President gave Mehegan, the cashier, the power to commit the fraud, but the opportunity to issue the spurious certificate was afforded by the negligent act of the corporation in leaving the blank certificates with Mehegan, who thereby acquired full control over them and the Bank has thus become the author of the fraud and the victim of its own misplaced confidence. But should the plaintiff, an innocent holder, be caused to suffer for what the Bank itself made it possible for him, Mehegan, to do? We think not. The decision of the case must turn upon the application of a simple and just principle of the law to its facts.

"Whenever one of the two innocent parties must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." *Lickbarrow v. Mason,* 2 T. R., 70.

It is well said by Lord Holt in *Hearn v. Nichols,* 1 Salk., 289, "For seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver should be a loser than a stranger."

"Where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposed a confidence, or by his negligent conduct made it possible for the

loss to occur, must bear the loss." *Railroad v. Kitchen,* 91 N. C., 39. ·

The principle has a striking illustration in the case of agency and has been extended to the acts of corporations, as we will presently see. "The rule has been established and may now also be stated as an indisputable principle that a corporation is responsible for the acts and negligence of its agents while engaged in the business of the agency, to the same extent and under the same circumstances that a natural person is chargeable with the acts and negligence of his agent, and 'There can be no doubt,' says Lord Ch. Cranworth in *Ranger v. Railroad,* 5 H. L. Cases, 86-87, 'that if the agents employed conduct themselves fraudulently so that if they had been acting for private employers the person for whom they were acting would have been affected by their fraud, the same principles must prevail where the principal under whom the agent acts is a corporation.'" *Railroad v. Schuyler,* 34 N. Y., 50.

There is no good reason for holding that this bank is not legally responsible for the fraudulent acts of the cashier Mehegan upon the ground that at the time he delivered the certificate to the plaintiff he was not in the performance of his master's business, but was acting for and in behalf of himself and outside the scope of his agency. This would be true as to all fraudulent acts and as to all acts done not strictly within the line of duty. The correct principle is that it will be quite sufficient to charge the employer with the liability, if all the acts of the employee are done within the apparent, though not real, scope of his agency.

In the case of *Railroad v. Bank,* 60 Md., 36, where the question is fully discussed, the court uses this language: "It may be conceded, and was doubtless the case, that the agent had no authority in fact to issue such certificate; he had no real authority as between himself and his principal, or

other parties conusant of the facts, for doing the particular acts complained of, but the company by its own act and, as it turned out, misplaced confidence, placed the agent in the position to do, and procure to be done, that class of acts to which the particular act in question belongs; and in such case where the particular act in question is done in the name of and apparently in behalf of the principal, the latter must be answerable to innocent parties for the manner in which the agent has conducted himself in doing the business confided to him.    Upon no other principle could the public venture to deal with an agent.    In such case the apparent authority must stand as and for real authority."    And again : "Where he issued such a certificate and delivered it to a third party, who acted without knowledge and in good faith, paying value for it, such party had the right to act upon the presumption that the representations of such certificates were truthful, and not false and fraudulent. ' Having confided to him the said trust of executing the business, the agent was held out to the public as competent, faithful and worthy of confidence; and though he deceived both his principal and the public, by forging and issuing false certificates, it is but reasonable that the principal, who placed him in the position to perpetrate the wrong should bear the loss."

But a decision was made upon substantially the same facts that we have in this case in favor of the holder of such a certificate in the case of *Titus v. Railroad*, 61 N. Y., 237, in which it was said, "Where the treasurer of a corporation upon the faith and pledge as collateral of spurious certificates, drawn up and executed in the form and manner prescribed by the by-laws, (signature of the president having been negligently affixed), purporting on its face to be of stock owned by the treasurer, obtained a loan of one acting in good faith and in ignorance of the fraud, there being nothing upon the face of the certificate to notify the lender of any defect in the

title, the corporation is liable to the holder for the value of the stock, if the stock of the company had been issued up to the full limit fixed by the charter."

The case of *Titus v. Railroad, supra,* has been cited with approval in many courts in this country and the principals therein stated and applied, meet with our unqualified approval as being those most consonant with reason and justice and we do not see why it should not be decisive of this case. Among the many cases sustaining the principle of that decision we cite the following: *Holbrook v. N. J. Z. Co.,* 57 N. Y., 616; *Bank v. Railroad,* 30 Conn., 231; *Allen v. Railroad,* 150 Mass., 200; 15 Am. St. Rep., 185; 5 L. R. A., 716; *Craft v. Railroad,* 150 Mass., 207; 5 L. R. A., 641; *Bank v. Ferry Co.,* 137 N. Y., 321; 19 L. R. A., 331; 33 Am. St. Rep., 712; *Bank v. Kurtz,* 99 Pa., 349; 44 Am. Rep., 112; *M. B. Co. v. Harned,* 27 Fed. Rep., 486; *Railroad v. Bank,* 53 Ohio St., 351; 43 L. R. A., 777; Clark on Corporations, 438; Mechem on Agency, Sec. 717.

We do not think there was anything in the face of the certificate to cause the plaintiff to suspect any fraud when she took it as collateral security for the loan to Mehegan. The mere fact that it was issued in the name of Mehegan, we have seen, was not sufficient for this purpose, and the requirement that it should be transferable on the books of the Bank cannot in our opinion, have any such effect. As the principle governing in such cases is so clearly and forcibly stated in the case of *McNeill v. Bank,* 46 N. Y., 325; 7 Am. Rep., 341, we quote at length from that decision: "The mere possession of chattels, by whatever means acquired, if there be no other evidence of property or authority to sell from the true owner, will not enable the possessor to give a good title. But if the owner intrusts to another, not merely the possession of the property, but also written evidence, over his own signature, of title thereto, and of an unconditional power of dispo-

sition over it, the case is vastly different. There can be no occasion for the delivery of such documents, unless it is intended that they shall be used, either at the pleasure of the depositary or under contingencies to arise. If the conditions upon which this apparent right of control is to be exercised are not expressed on the face of the instrument, but remain in confidence between the owner and the depositary, the case cannot be distinguished in principle from that of an agent who receives secret instructions qualifying or restricting an apparently absolute power. * * * It was only necessary to a valid transfer as between the parties, that the assignment and power should be in writing. The common practice of passing the title to stock by delivery of the certificate with blank assignment and power, has been repeatedly shown and sanctioned in cases which have come before our courts. * * * It has also been settled by repeated adjudications that, as between the parties, the delivery of the certificate with assignment and power endorsed, passes the entire title, legal and equitable, in the shares, notwithstanding that by the terms of the charter or by-laws of the corporation, the stock is declared to be transferable only on its books; that such provisions are intended solely for the protection of the corporation, and can be waived or asserted at its pleasure, and that no effect is given to them except for the protection of the corporation; that they do not incapacitate the shareholder from parting with his interest, and that his assignment, not on the books, passes the entire legal title to the stock, subject only to such liens or claims as the corporation may have upon it, and excepting the right of voting at elections." * * *

"By omitting to register his transfer, the holder of the certificate and power fails to obtain the right to vote, and may lose his stock by a fraudulent transfer on the books of the company, by the registered holder, to a *bona fide* purchaser. But, in this respect, he is in a condition analogous to that of

the holder of an unrecorded deed of land, and possesses a no
less perfect title as against the assignor and others.  And
he would have no action against the corporation for allowing
such a transfer in violation of his rights.   He also takes the
risk of collection of dividends by his assignor, or of any lien
the corporation may have on the shares.   But in other res-
pects his title is complete.

The holder of such a certificate and power possesses all the
external *indicia* of title to stock, and an apparently unlimited
power of disposition over it.   He does not appear to have,
as is said in some of the authorities cited, concerning the
assignee of a chose in action, a mere equitable interest, which
.is said to be notice to all persons dealing with him that they
take subject to all equities latent or otherwise, of third par-
ties; but apparently, the legal title and the means of transfer-
ring such title in the most effectual manner. · Such, then,
being the nature and effect of the documents with which the
plaintiff intrusted his brokers, what position does he occupy
toward persons who, in reliance upon those documents, have
in good faith advanced money to the brokers or their assigns
on a pledge of the shares?   When he asserts his title and
claims as against them that he could not be deprived of his
property without his consent, cannot he be truly answered
that by leaving the certificate in the hands of his brokers,
accompanied by an instrument bearing his own signature,
which purported to be executed for a consideration, and to
convey the title away from him, and to empower the bearer
of it irrevocably to dispose of the stock, he, in fact 'substituted
his trust in the honesty of his brokers for the control which
the law gave him over his own property', and that the con-
sequence of a betrayal of that trust should fall upon him who
reposed it, rather than upon innocent strangers from whom
the brokers were thereby enabled to obtain their money."

See also *Loring v. Salisbury Mills,* 125 Mass., 150; *Ley-*

*son v. Davis,* 17 Mont., 220; 31 L. R. A., 429; *Stone v. Hackett,* 12 Gray (Mass.), 231.

The text writers are equally explicit in stating the doctrine. Morawitz Private Corporations, Sec. 185, says: "By general merchantile usage, shares in a corporation are assignable by indorsement and delivery of the certificate issued to the owner as evidence of his rights. It is well settled that, after a certificate for shares has been endorsed by the holder, with an assignment and power of attorney to execute a transfer upon the stock-books the name of the transferee and attorney being left blank, the certificate thus endorsed may be passed from hand to hand, and the last holder will be entitled to fill up the assignment and power of attorney, and complete the transfer by entry upon the books of the company. Stock certificates of all kinds have been constructed in a way to invite the confidence of business men, so that they have become the basis of commercial transactions in all the large cities of the country, and are sold in open market, the same as other securities. Although neither in form or character negotiable paper, they approximate to it as nearly as practicable. If we assume that the certificates in question are not different from those in general use by corporations, and the assumption is a safe one, it is easy to see why investments of this character are sought after and relied upon. No better form could be devised to assure the purchaser that he can buy with safety. He is told under the seal of the corporation, that the shareholder is entitled to so much stock, which can be transferred on the books of the corporation in person or by attorney, when the certificates are surrendered but not otherwise. This is a notification to all persons interested to know that whoever in good faith buys the stock, and produces to the corporation the certificate, regularly assigned, with power to transfer, is entitled to have the stock transferred to him. And the notification goes further, for it assures the

holder that the corporation will not transfer the stock to any one not in possession of the certificate."

It follows therefore from the application of these principles, which are sustained by the highest authority, that the plaintiff was not notified in any way by the certificate itself that it had not been regularly issued; nor was there anything on its face calculated to arouse suspicion or inquiry and to put her on her guard. She was therefore, as between the bank and herself, the *bona fide* holder for value of the certificate with an unimpeachable title thereto, and if the certificate was not an overissue of stock, she is entitled to a transfer of it on the books of the bank and to a new certificate, and if the stock of the bank has been issued to the full limit authorized at the time, which appears to be the case from the facts agreed, she is entitled to recover its value of the defendant. *Bank v. Lanier,* 11 Wallace, 369.

The defendants' counsel in his argument before us relied on the case of *Moores v. Bank,* 111 U. S., 156. That case is quite different from ours in that the cashier agreed to give the plaintiff in that suit a certificate of stock which he alleged had been issued to himself, whereas he deposited with the plaintiff one in her own name, and the court attached great importance to this fact, and held that it was notice to her, and rather intimated that if the stock had been issued in the cashier's name the decision would have been the other way. The defendants' counsel also relied on the case of *Farrington v. Railroad,* 150 Mass., 406; 5 L. R. A. 849; 15 Am. St. Rep. 222, but, upon examination of the facts of that case, we find that they are substantially the same as those in the case of *Moores v. Bank, supra.* We think that those cases can easily be distinguished from the one at bar, but if they cannot be, we would refuse to follow them, as we believe that the principles we have laid down as those which should control the decision of this case, are perfectly sound and in full accord

with reason and right. We are of the opinion that the adoption of any other principle as applicable to such a case, would seriously impair the integrity of business transactions, and by destroying public confidence in such securities, would prevent the free and untrammeled dealing in stock certificates and other paper of a like kind, which is so essential to the maintenance of their value and usefulness and to the success of many important and legitimate business enterprises. The effect of a contrary rule would indeed be very baneful and far-reaching. It is better to stand by the old and familiar principle, and place the loss upon the one whose negligent, though perhaps, innocent act brought it about. The judgment of the court below is reversed and judgment will be entered in that court for the plaintiff in accordance with the facts agreed upon by the parties and in conformity with the principles herein set forth.

*Per Curiam.*    Judgment Reversed.