CITIZENS STATE BANK, Respondent, v. SECURITY BANK OF TYNDALL et al, Appellant.

(222 N. W. 932.)

(File No. 6567. Opinion filed January 5, 1929.)

234

*Roy E. Willy,* of Sioux Falls, *Orvis & French,* of Yankton, and *F. M. Scoblic,* of Tyndall, for Appellants.

*Walker & Gurley,* of Armour, *Wicks & Quinn,* of Scotland, S. D., and *G. M. Caster,* of Lake Andes, for Respondent.

BURCH, P. J.  This action is brought by the Citizens' State Bank of Armour to recover upon a certificate of deposit alleged to have been issued by the Security Bank of Tyndall.  The Security Bank is insolvent and in the hands of the superintendent of banks for liquidation, and the superintendent of banks, F. R. Smith, is therefore a party defendant with the defendant bank.  All facts were stipulated and found by the court as stipulated.

Both banks are corporations.  On December 1, 1924, and at all times thereafter material to the issues involved, Geo. E. Pfeifle was the cashier and managing officer of the defendant Security Bank.  On December 23, 1924, said Pfeifle issued to plaintiff a certificate of deposit for $9,000 on a regular form of the Security Bank.  This certificate has its inception in a fraudulent scheme of Pfeifle and one Frank R. Beddow, who conspired to issue certificates of deposit upon the regular forms then in use by the Security Bank and to negotiate them for their own use and benefit.  Beddow was not an officer, agent or employee of or in any way connected with the bank.  Such certificates were to be made payable to the order of such persons as Beddow would designate; were to be delivered to Beddow or his representative for negotiation; no record was to be made in the books of the bank; and the bank was to receive no consideration therefor.  In furtherance of this scheme Pfeifle took from the vaults of the Security Bank the last-numbered pad of blank certificates of deposit containing 100 blank certificates.

One of these certificates, in the amount of $9,000, was issued to the order of Frank Groesbeck, a farmer residing near Armour, S. D., to whom Beddow had previously sold some California land on a contract. Beddow represented to Groesbeck that he had resold the California land and had obtained $9,000 in cash, which he had deposited in the defendant bank, receiving this certificate therefor. He then offered to sell the certificate and get the money for Groesbeck if Groesbeck preferred. Groesbeck thereupon surrendered his land contract to Beddow and indorsed the certificate in blank, leaving it with Beddow for disposition. Beddow delivered the certificate to F. M. Early, who was evidently an accomplice of Beddow and Pfeifle, and Early disposed of the certificate to the Citizens' State Bank, respondent. Early was not connected with either bank as an officer, agent or employee. In dealing for the certificate, respondent exercised care. Its president, Raben, insisted on the presence of Groesbeck, and as the certificate was marked "Not negotiable," called the appellant Security Bank by telephone to ascertain if the certificate was genuine and subject to no defenses. Pfeifle answered the telephone call and assured Mr. Raben in effect that the certificate was all right, genuine, and subject to no defense. Respondent also wrote a letter to appellant bank and received an answer written by Pfeifle to the same effect. Respondent then dealt for the certificate, paying Early $2,500, which he claimed as commission from Groesbeck on a land sale, and took the balance of the certificate as collateral security for a debt owing respondent from Groesbeck. By arrangement between respondent and Pfeifle the Groesbeck certificate was surrendered and a new certificate issued in lieu thereof direct to respondent as payee. Both the Groesbeck certificate and the new certificate were obtained from the pad of blanks above mentioned, no record was made of either, and the Security Bank received no consideration for either.

In all these transactions plaintiff acted in good faith, believing and relying upon the statements made and the letters written to it by the cashier of the defendant bank, and the plaintiff bank had no knowledge or information of any kind or character that the Groesbeck certificate was not issued in the regular course of banking business, for money actually deposited, and had no knowledge or information that there was anything irregular, wrong, or illegal

in the issuance or negotiation of the Groesbeck certificate, and the plaintiff bank and its officers believed and relied and acted upon the oral and written representations of the cashier of the defendant bank in taking over said certificate.

The trial court concluded that the defendants are estopped to question the validity of the certificate of deposit in suit and awarded judgment in favor of plaintiff for $9,000 and interest. Defendants appeal from the judgment.

The principal question presented by this appeal is the liability of the Security Bank in a suit upon the certificate under the circumstances disclosed. As a matter of secondary importance it is urged that in no event can respondent recover more than $2,500, the cash actually advanced at the time of the transaction. The principal question will receive first consideration.

The certificate was false and fraudulent, issued in furtherance of a conspiracy, without authority, without consideration, without the knowledge of any officer of the bank other than Pfeifle, a conspirator, and no record was made whereby any other officer could have by diligence discovered the fraud. And this is true as to all transactions and negotiations involved in this action.

Pfeifle acted for himself and his fellow conspirators, in total disregard of the interests of the bank and wholly without authority. But while so acting for himself and partners in crime, he acted in the name of his principal though not *for* it. Where one acts *for another,* whether within or in excess of authority, the effect of such act upon the principal must be measured by the law of agency proper. Where one acts *for himself* there is no agent and no principal in fact, although the act may appear to be the act of an agent for a principal. There can be no doubt as to the capacity in which Pfeifle acted in issuing the spurious certificate in suit. The real question here is, how far may one who employs a general agent to transact his business be bound, if at all, by the acts of such person in using the name and instruments of his employer in a transaction apparently for his employer? There can be no doubt that respondent in good faith intended to and believed it did deal with appellant bank, and not with Pfeifle. Can appellant now be heard to say that respondent did not deal with it; that it did not issue the certificate; that such certificate is a forgery, spurious, and not binding on it?

If we hold the bank liable we bind it to the payment of a spurious, false, and forged instrument, because the forger was its cashier and by reason of that position able to give to the forged instrument the appearance of genuineness. Such certificate, being spurious, could not be rendered valid by ratification, being entirely ultra vires and beyond the power of any officer or board to sanction. On what priciple can the bank be held? There must be very different legal principles governing acts of agents and those of pseudo-agents. With this distinction in mind we review the cases. Those cases involving acts of true agents are not in point. We will not attempt to review all the cases cited by either side. But we have studied them with many others to find if possible the correct principle upon which the cases turned or should have turned. Respondent cites a number of cases involving the liability of a telegraph company for the transmission of forged and fraudulent messages by its officers, agents, or employees. Others involve the liability of warehousemen on false and fraudulent warehouse receipts issued by their agents. Appellant cites a case in point involving the liability of a railroad company upon a false bill of lading for cotton issued by its agent without receipt of the cotton. And section 1275, R. C. 1919, is cited as statutory authority for holding the principal liable for the wrongful acts of his agent.

This court held in Fletcher v. Great Northern Elevator Co., 12 S. D. 643, 82 N. W. 184, that a warehouseman, whose agent fraudulently issues a receipt for grain, which has not been received, is estopped to deny that the grain mentioned in the receipt has been received, as against a bona fide holder for value. In that case the recitals in the receipt were treated as representations of the elevator company by which it might be estopped. That case is so similar in principle to the case at bar that it cannot be distinguished. In that case a warehouse receipt was, as is the certificate in the instant case, false and spurious, issued without authority for and on behalf of a faithless employee and not for or in the interest of the elevator company, and the company received nothing for it. But this court does not seem to have considered those facts as showing a transaction wholly without the scope of the agency. Under such circumstances there was nothing upon which the agency could act. The recitals in the receipt were no more binding representations of the company than was the issuance of the receipt a binding

transaction of the company. The company neither issued the receipt nor made any representations regarding it. That case does not discriminate between an unlawful and wrongful act of the company and the unlawful and wrongful act of another. The failure to so discriminate may have been due to the fact that the wrongdoer was an officer, agent, or employee of the elevator company in whose name the receipt was issued. But holding that position did not render him incapable of acting for himself nor make his every act an act of his principal.

Again, in Citizens' Nat. Bank v. Great Western Elevator Co., 13 S. D. 1, 82 N. W. 186, this court held warehouse receipts to be binding on the elevator company, although fraudulently issued by one of its agents, placing its decision on the authority of Fletcher v. Elevator Co., supra, without discussion.

Neither of the two above-cited cases present any satisfactory reason for the rule announced. And the result reached did not sustain a judgment for a recovery of the grain mentioned in the receipt or its value, but sustained a judgment limiting a recovery to the amount paid for the receipt, and, in effect, held that to be the correct measure of damage. If the receipt was valid it would seem that the purchaser should have recovered the grain or its value. In the Fletcher Case, Griswold v. Haven, 25 N. Y. 595, 82 Am. Dec. 380, was cited as supporting the rule announced. That was an action to hold a partnership liable upon a warehouse receipt issued by one of the partners for his individual use without a deposit of grain covered by the receipt. There the court seems to have had in mind the distinction between the acts of an agent when acting for himself and when acting for his principal, for it is said:

"The idea that the responsibility of a principal for the frauds of his agent rests in all cases upon the ground that he has in some way, either actually or apparently, authorized the fraudulent act, or has received the benefit of the fraud, and therefore, adopted it, must be given up. It would be a very artificial and unnatural mode of reasoning that should apply that doctrine to the principal's liability for the negligence of his agent; and this liability and that for fraud belong to the same class, and rest upon the same reason. The reason is, that every person employing an agent is under obligation to pay some regard to the diligence, skill and integrity of the agent he selects, and to his fitness to perform the duties with which he is charged."

■ If that is the true reason then it may be suggested that there is nothing in the case at bar to show that the bank did not pay some regard to the diligence, skill, and integrity of the agent selected; nor that it did not use the utmost care in selecting Pfeifle cashier. Negligence cannot be presumed. If that be the reason, then proof of care ought to be a defense. On the other hand, in a case in point cited by appellant, Friedlander v. Texas & P. Ry. Co., 130 U. S. 416, 9 S. Ct. 570, 32 L. Ed. 991, an action brought against the railway company to recover for nondelivery of certain cotton named in a bill of lading falsely and fraudulently issued by a station agent without a delivery of the cotton for shipment, the court said:

"It is a familiar principle of law that where one of two innocent parties must suffer by the fraud of another, the loss should fall upon him who enabled such third person to commit the fraud; but nothing that the railroad company did or omitted to do can be properly said to have enabled Lahnstein to impose upon Friedlander & Co. The company not only did not authorize Easton to sign fictitious bills of lading, but it did not assume authority itself to issue such documents except upon the delivery of the merchandise. Easton was not the company's agent in the transaction, for there was nothing upon which the agency could act. * * * The fraud was in respect to a matter within the scope of Easton's employment or outside of it. It was not within it, for bills of lading could only be issued for merchandise delivered; and being without it, the company, which derived and could derive no benefit from the unauthorized and fraudulent act, cannot be made responsible. British Mutual Banking Co. v. Charnwood Forest Railway Co., 18 Q. B. D. 714. The law can punish roguery, but cannot always protect a purchaser from loss, and so fraud perpetrated through the device of a false bill of lading may work injury to an innocent party, which cannot be redressed by a change of victim."

The reasoning in the last-cited case has the advantage in logic over those cases holding the principal liable.

Nevertheless, we find a large number of cases, including our own state in the elevator cases above cited, in which corporations have been held for fraud of their officers committed in circumstances similar to those in the case at bar. That is, in cases where the officer acts in the name of and apparently for the corporation,

but in fact against its interests and for and in the interest of himself or some one else. Fletcher v. Great Western Elevator Co., 12 S. D. 643, 82 N. W. 184; Citizens' Nat. Bank v. Great Western Elevator Co., 13 S. D. 1, 82 N. W. 186; Pacific Postal Tel. Cable Co. v. Bank of Palo Alto, 48 C. C. A. 413, 109 F. 369, 54 L. R. A. 711; Griswold v. Haven, 25 N. Y. 595, 82 Am. Dec. 380; North River Bank v. Aymar, 3 Hill (N. Y.) 262; N. Y. & N. H. Ry. Co. v. Schuyler, 34 N. Y. 30; Eastin v. Bank of Harrisonville, 213 Mo. App. 130, 246 S. W. 991; Eugen v. Merchants' & Mfrs.' State Bank, 164 Minn. 293, 204 N. W. 963, 43 A. L. R. 610, and note, where many cases are cited, and the general rule is said to be in favor of holding corporations, at least, liable for the acts of their officers.

The reasoning in the many cases so holding is not always satisfactory, but the rule seems to be well established. Perhaps the most satisfactory reason is that it is deemed to be founded in public policy.

In Western Maryland Ry. Co. v. Franklin Bank, 60 Md. 36, a corporation was held liable for the acts of its treasurer in issuing forged and false certificates. It was there contended as here that the agent was not employed to issue such fraudulent certificates and that his act should not therefore bind the company. But the court refused to consider alone the contractual relations between the principal and agent, but considered also the rights of the public in relation to the business conducted by the principal. The court said: The company "placed the agent in position to do, and procure to be done, that class and description of acts to which the particular acts in question belong; and in such case, where the particular acts in question are done in the name of, and apparently on behalf of the principal, the latter must be answerable to innocent parties for the manner in which the agent has conducted himself in doing the business confided to him. Upon no other principle could the public venture to deal with an agent."

In Bank of Kentucky v. Schuylkill Bank, 1 Pars. Eq. Cas. (Pa.) 180, the court said in reference to such wrongful acts of agents: "In all such cases the principal holds out his agent as competent and fit to be trusted; and thereby, in effect, warrants his fidelity and good conduct in all matters of the agency."

In Pacific Postal Tel. Cable Co. v. Bank of Palo Alto, supra,

there is a careful discussion of the principles involved, a review of other telegraph cases, and the conclusion reached that the company is liable for damage resulting from the sending of a false and forged telegram. It is there recognized that such act was without the scope of the agent's authority, although within the general course thereof. It is said, "It would ordinarily be an unreasonable and impracticable rule to require the receiver of a dispatch to investigate the question of the integrity and fidelity of the defendant's agent," and therefore the principal is held to guarantee the fidelity and integrity of its agents in such circumstances, on the ground that it owes a duty to the public or third persons. "If the agent or servant, while so employed by the corporation, by his wrongful and malicious act occasions a violation of that duty, or an injury or loss to the person interested in its faithful performance by or on behalf of the corporation, the principal is held liable for the breach of it."

But such liability sounds in tort and not in contract. There is no sound reason for holding the principal liable in contract under such circumstances, for the principal has not in fact acted or contracted. In many cases such as those involving the liability of telegraph companies for sending and delivering forged or false telegrams the action is in tort, but in other cases where the action is brought upon a purported instrument, as in the elevator cases cited, the corporation has generally been held to be estopped to deny its validity to the extent of the corporation's liability to the holder of the instrument. And this procedure seems to be as well settled as the rule holding the corporation liable for such wrongful acts of its officer. By estopping the corporation to deny its participation in the fraud the injury is diverted from the victim of the fraud to the corporation, which must bear the loss. In many cases the amount of damage is obvious and the correct result can be reached by treating the corporation as having received the proceeds of the fraud, which it should disgorge. Other cases will not be so easily determined in this manner, and the extent of the estoppel will depend upon the circumstances and result sought to be effected. There may be cases where no estoppel can be applied, but where damages must be obtained only by direct judgment for tort. In the instant case respondent is a good-faith holder of the certificate in suit without negligence, and is

entitled to recover of appellant any damage it may have suffered by the wrongful acts of Pfeifle in obtaining its money upon the forged certificate. By estopping the bank to deny receipt of the proceeds thereof it may be compelled to pay to respondent the amount fraudulently obtained by Pfeifle's acts, and thereby right the injury.

The present consideration paid, however, was only $2,500, and not the face of the certificate, $9,000. Except for the amount paid out the certificate is held by respondent as security for Groesbeck's obligation owing to it at the time the certificate was acquired. As such it is worthless, but the assignment of the Groesbeck fraudulent certificate to respondent in lieu of which the certificate in suit was issued ought to be treated as an assignment of Groesbeck's cause of action for tort on that certificate. Whatever injury Groesbeck suffered thereby may be recovered by respondent by virtue of such assignment. The case was not tried upon the correct theory as an action for damages, but on the theory that the certificate was a binding obligation of the bank. For that reason the injury to Groesbeck was not involved nor considered by the court as an element of respondent's recovery. In view of the unusual facts and more or less unsettled law governing we do not think any of the attorneys are to be blamed for thus trying the case, and for that reason the cause is remanded and respondent given an opportunity to establish the amount, if any due it, under the assignment from Groesbeck.

The judgment is reversed and the cause remanded for further proceedings in harmony with this opinion. No costs to be taxed in this court.

POLLEY, SHERWOOD, CAMPBELL, and BROWN, JJ., concur.